2002 WY 45

**James LANCASTER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 00–235.

Supreme Court of Wyoming.

March 28, 2002.

Rehearing Denied April 23, 2002.

finding that defense counsel was not ineffective in failing to file a motion to suppress evidence, we affirm.

## ISSUES

[¶ 2] Three issues are presented in this appeal:

*ISSUE I*

Whether the district court erred when it allowed a videotaped re-enactment of the crime to be admitted into evidence?

*ISSUE II*

Whether the prosecutor committed prosecutorial misconduct when he elicited from witnesses [1] a comment on [Lancaster's] right to remain silent, [2] victim impact statements, and [3] comments on Lancaster's veracity?

*ISSUE III*

Whether defense counsel's failure to move to suppress evidence seized during an illegal search of Lancaster rendered counsel's assistance ineffective?

The State of Wyoming phrases the issues in substantially the same manner.

Kenneth M. Koski, Public Defender, and Donna D. Domonkos, Appellate Counsel, Representing Appellant.

Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Kimberly A. Baker, Senior Assistant Attorney General, Representing Appellee.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] James Norman Lancaster appeals his convictions for the first-degree premeditated murder of Dana Penn and the attempted first-degree premeditated murder of Monte Hanson. Finding harmless error in the trial court's admission into evidence of a videotaped re-enactment of the crimes, finding either no error or harmless error in the allegations of prosecutorial misconduct, and

## FACTS

[¶ 3] In May 1999, James Lancaster (the appellant) and Monte Hanson (Hanson) lived in separate apartments in the Star Apartments in Casper. Hanson's friend, Dana Penn (Penn), often visited Hanson. On May 16, 1999, Hanson and Penn spent the day drinking beer at Hanson's apartment. At about 10:00 p.m., the appellant invited Hanson and Penn to his apartment to drink whiskey.

[¶ 4] Upon arriving at the appellant's apartment, the trio began drinking double shots of whiskey while watching television and talking. Hanson and Penn were in the appellant's apartment for thirty minutes to an hour. As they talked, Hanson and the appellant sat on the couch; Penn sat on the floor. At some point, the appellant showed Hanson and Penn two knives, one "a big knife, real big knife" and one "a littler knife ... like a Bowie knife, maybe," according to

Hanson. Penn eventually fell asleep or passed out on the floor.[1]

[¶ 5] Hanson and the appellant, both of whom testified at trial, told vastly different stories as to how the evening's events came to an end. Hanson testified that he decided it was time to leave, so he tried to awaken Penn. Suddenly, and with no provocation, the appellant stabbed Hanson and cut his throat. The two then battled throughout the apartment, with Hanson trying to escape and the appellant continuing to stab him. During a lull in the attack, as Hanson hid behind a door, he feared that the appellant had "gone after" Penn. Hanson then ventured back toward the living room, only to encounter the appellant holding a rifle.[2] Hanson testified that the appellant began shooting at him, hitting him once in the neck. Hanson grabbed the gun, and as they wrestled over it, Hanson was able to pull the trigger until the gun was empty. The appellant then disappeared and Hanson escaped to the landlord's apartment, where the police were called.

[¶ 6] The appellant's version of these events differed significantly from Hanson's. The appellant testified that, as he and Hanson talked on the couch and Penn slept on the floor, Hanson asked to see the appellant's rifle and inquired about purchasing it. The appellant retrieved the loaded rifle from its accustomed location in the bedroom closet. Not being comfortable handing a loaded rifle to anyone, the appellant commenced to unload it the only way he knew how—by pulling the bolt back "until bullets jump out of it." As he did so, Hanson grabbed the barrel without warning, and the gun fired. The two then began fighting for the rifle, with the appellant's hands on the stock, Hanson pulling the trigger, and the rifle firing. The appellant then grabbed a knife and "cut"

Hanson to get him to release the rifle. When the rifle was empty, Hanson let go of it. The appellant then fled the apartment, but only after stopping to reload the rifle, which he took with him.

[¶ 7] Police officers responding to the Star Apartments found Penn lying dead on the appellant's living room floor. An autopsy determined that Penn bled to death from twelve stab wounds to the upper body and a gunshot wound to the head, the gunshot wound occurring after the stab wounds.

## WHETHER THE TRIAL COURT ERRED WHEN IT ALLOWED A VIDEO-TAPED RE ENACTMENT OF THE CRIME TO BE ADMITTED INTO EVIDENCE?

### FACTUAL AND PROCEDURAL BACKGROUND

[¶ 8] On May 24, 1999, Hanson accompanied police officers to the Star Apartments, where a videotape was made of his actions and statements during a re-enactment of the crimes. The videotape, which is approximately eighteen minutes in length, shows Hanson moving about in the appellant's apartment, alternatively making statements and answering the officers' questions. At the beginning of the videotape, Hanson removes his shirt, the result being that his considerable knife and bullet wounds are visible throughout the taping.

[¶ 9] Prior to trial, the appellant filed a Motion to Exclude Evidence directed in part to this videotape.[3] The motion alleged that the videotaped statement was hearsay and that its introduction into evidence would violate W.R.E. 801(c).[4] The motion was set for hearing on May 3, 2000. At the hearing, the parties stipulated that the videotape would not be offered as evidence by the State "ab-

---

1. Penn's blood-alcohol content was later determined to be .48 percent.

2. A .22 caliber Marlin or Glenfield, model 60.

3. Counsel sometimes refer to the videotape as a re-enactment, sometimes as a statement, and sometimes as an interview. A viewing of the videotape reveals that it is a combination of all three.

4. W.R.E. 801(c) contains the definition of hearsay: " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." It is actually W.R.E. 802 that prohibits the introduction of hearsay: "Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court of Wyoming or by statute."

sent rehabilitation or a prior consistent statement...."

[¶ 10] Hanson testified at trial and was cross-examined by defense counsel. At the end of redirect examination, the State offered the videotape into evidence and asked that it be played for the jury. Defense counsel objected. After hearing arguments on the objection, and after viewing the videotape, the trial court overruled the appellant's objection and allowed the videotape to be played for the jury. At defense counsel's request, the trial court then gave the following limiting instruction:

> Ladies and gentlemen of the jury, the videotape statement of Mr. Hanson, which you just viewed, is offered to you and should be considered by you only for the limited purposes of evaluating the credibility of the declarant, Mr. Hanson. It should not be considered by you for any other purpose, and I'm specifically instructing you that it should not be considered directly as proof of the matters asserted within that tape.

STANDARD OF REVIEW

[¶ 11] The standard for reviewing a trial court's rulings on the admissibility of evidence is well known. Such decisions are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *Story v. State,* 2001 WY 3, ¶ 9, 15 P.3d 1066, 1068 (Wyo.2001); *Blumhagen v. State,* 11 P.3d 889, 892 (Wyo.2000). Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary or capricious manner. *Trujillo v. State,* 2 P.3d 567, 571 (Wyo.2000) (*quoting Solis v. State,* 981 P.2d 34, 36 (Wyo.1999)).

[¶ 12] A trial court's evidentiary rulings " 'are entitled to considerable deference,' " and will not be reversed on appeal so long as " 'there exists a legitimate basis for the trial court's ruling....' " *Robinson v. State,* 11 P.3d 361, 367 (Wyo.2000), *cert. denied,* 532 U.S. 980, 121 S.Ct. 1620, 149 L.Ed.2d 483 (2001) (*quoting Simmers v. State,* 943 P.2d 1189, 1197 (Wyo.1997)). The appellant bears the burden of proving an abuse of discretion. *Trusky v. State,* 7 P.3d 5, 11 (Wyo.2000); *Trujillo,* 2 P.3d at 571 (*quoting Solis,* 981 P.2d at 36). Even where a trial objection has been made to the admission of evidence, error cannot be found unless "a substantial right of the party is affected...." W.R.E. 103(a)(1). These general rules apply to rulings on the admissibility of hearsay evidence. *Young v. HAC, LLC,* 2001 WY 50, ¶ 6, 24 P.3d 1142, 1144 (Wyo.2001); *Robinson,* 11 P.3d at 367.

### W.R.E. 801(D)(1)(b)

[¶ 13] Hearsay is inadmissible under W.R.E. 802, "except as provided by these rules...." In that regard, the Wyoming Rules of Evidence provide two types of exceptions whereby statements that might otherwise be excluded as hearsay may be admitted into evidence. First, W.R.E. 801(d) declares that certain prior statements by witnesses and certain admissions by a party opponent are "not hearsay." Second, W.R.E. 803 and 804 contain lists of "[h]earsay exceptions." W.R.E. 801(d) statements are admissible because they are "defined out" of the hearsay definition. W.R.E. 803 and 804 statements are admissible because, though they are hearsay, they have sufficient "guarantees of trustworthiness...." *See* W.R.E. 803(24) and 804(b)(6).

[¶ 14] In the instant case, we are concerned with W.R.E. 801(d)(1)(B), which reads as follows:

> (d) ... A statement is not hearsay if:
>
> (1) ... The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]

[¶ 15] The focus of W.R.E. 801(d)(1)(B) is the use of a prior consistent statement as rehabilitation of a witness whose credibility has been impeached in the particular manner described in the rule. Because of the limited purpose for which the statement may be offered, the party contesting admission of the statement is entitled to

a limiting instruction to that effect.[5] W.R.E. 801(d)(1)(B) removes from the hearsay category only a prior consistent "statement," as that term is defined in W.R.E. 801(a): "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." As so defined, "statement" refers to a " 'single declaration or remark' " rather than a " 'report or narrative.' " *Humphrey v. State,* 962 P.2d 866, 871 (Wyo.1998) (*quoting Kolb v. State,* 930 P.2d 1238, 1245 (Wyo.1996), *cert. denied,* 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000)). It is necessary, therefore, to "break down the narrative and determine the separate admissibility of each 'single declaration or remark.' " *Kolb,* 930 P.2d at 1245 (*quoting State v. Phillips,* 194 W.Va. 569, 461 S.E.2d 75, 91 (1995)).[6]

[¶ 16] The United States Supreme Court has interpreted the federal rule upon which W.R.E. 801(d)(1)(B) is based as allowing prior consistent statements into evidence only when the statement was made before the motive to fabricate or the improper influence occurred. *Tome v. United States,* 513 U.S. 150, 165, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). In the past, this Court interpreted W.R.E. 801(d)(1)(B) in the same way. *Chambers v. State,* 726 P.2d 1269, 1273 (Wyo. 1986). We have since receded from that conclusion, holding instead that since there is no such temporal condition in the rule, it should be left to the discretion of the trial court whether a particular statement should be admitted. *Makinen v. State,* 737 P.2d 345, 349 (Wyo.1987). With some lack of unanimity, we have continued to apply the *Makinen* holding. *Beartusk v. State,* 6 P.3d 138, 145 (Wyo.2000); *Dike v. State,* 990 P.2d 1012, 1024 (Wyo.1999), *cert. denied,* 529 U.S. 1078, 120 S.Ct. 1697, 146 L.Ed.2d 502 (2000). In departing from federal precedent, this Court emphasized the inherent difficulty in determining when an improper motive may have arisen, and chose to leave such matters to the trier of fact. *Makinen,* 737 P.2d at 349.

[¶ 17] W.R.E. 801(d)(1)(B) has four requirements: (1) that the declarant testify at trial; (2) that the declarant be subject to cross-examination concerning the prior statement; (3) that the prior statement be consistent with the declarant's trial testimony; and (4) that the prior statement be offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. Evidently because the first two requirements have not been problematic, appellate review has focused on the consistency and rebuttal issues. In *Curl v. State,* 898 P.2d 369, 374 (Wyo.1995), we reiterated what "consistent" means under Wyoming's rule:

Curl correctly points out that statements must be "consistent" to merit admission under W.R.E. 801(d)(1)(B). *Montoya v. State,* 822 P.2d 363, 368 (Wyo.1991). However, little supportive case law and less logic is offered to bolster his argument that consistency requires a virtual identity or congruence between the testimony of the principal witness and the subsequent statements.

Professor Mueller points out that "[w]hat seems important is that the exception should not be the means to prove new points not covered in the testimony of the [primary witness]." 4 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 405 at 181 (2d ed.1994). Professor Mueller notes that it is the **consistency,** rather than the substance of the consistent statement, which takes such a statement out of the realm of objectionable

---

5. In the instant case, the State limited its offer of the videotape for the purposes of rehabilitation as a prior consistent statement, and the appellant's requested limiting instruction was given. We will not, therefore, venture to address the question of whether a prior consistent statement may under certain circumstances be admitted for the truth of the matter asserted. *See Dike v. State,* 990 P.2d 1012, 1024 (Wyo.1999), *cert. denied,* 529 U.S. 1078, 120 S.Ct. 1697, 146 L.Ed.2d 502 (2000); *Stephens v. State,* 774 P.2d 60, 71 (Wyo.1989); 4 Christopher B. Mueller and Laird

C. Kirkpatrick, *Federal Evidence* § 406 at 194 (2d ed.1994); and Debra T. Landis, Annotation, *Admissibility of Impeached Witness' Prior Consistent Statement—Modern State Criminal Cases,* 58 A.L.R.4th 1014, 1029–35, 1987 WL 419672 (1987).

6. *See also Johnson v. State,* 930 P.2d 358, 362–63 (Wyo.1996) for a similar holding in the context of a statement against interest under W.R.E. 804(b)(3).

hearsay and tends to prove the value of the original statement. *Id.*, § 406 at 194.

We have, essentially, embraced the foregoing theoretical framework, asserting that consistency itself is what removes such statements from the realm of inadmissible hearsay. *Montoya*, 822 P.2d at 368. Error, if any, may be considered harmless when the content of challenged consistent statements is clearly cumulative of prior testimony. *Id.* Logically, however, material information presented for the first time to support a prior "consistent statement" has no antecedent with which to be consistent or inconsistent and is, therefore, inadmissible.

(Emphasis in original.)

[¶ 18] The fourth requirement of W.R.E. 801(d)(1)(B) is that there must be an express or implied charge of recent fabrication or improper motive. *Cook v. State*, 7 P.3d 53, 58 (Wyo.2000) (*quoting Makinen*, 737 P.2d at 349). The charge of fabrication or improper motive need not come only as a specific allegation during cross-examination; rather, it may be made by implication or innuendo, and it may be found in the "thrust" of the defenses and testimony presented. *Alicea v. State*, 13 P.3d 693, 698–99 (Wyo. 2000); *Cook*, 7 P.3d at 57–58. Further, it is not necessarily error that the prior consistent statement was received in evidence before the allegation of fabrication or improper motive. *Humphrey*, 962 P.2d at 872.

## DISCUSSION

[¶ 19] The appellant's Motion to Exclude Evidence referenced hearsay and W.R.E. 801(c). At the motion hearing, counsel stipulated that the videotape would be offered, if at all, only as "rehabilitation or a prior consistent statement...." As a result, the admissibility of the videotape is to be determined by reference to W.R.E. 801(d)(1)(B). When the videotape was offered at trial, defense counsel objected, and the following colloquy took place:

[DEFENSE COUNSEL]: Your Honor, at this particular point, I would again interpose my objection to using the videotaped interview, which we had made a liminal motion with respect to earlier and a motion to exclude evidence which was heard by the Court prior to trial.

This videotaped interview is an interview with Mr. Hanson, conducted by the police officers, in which Mr. Hanson does a re-enactment, basically, and a walk-through of the apartment on the 20th. The Court sustained my objection to the use of this videotape. We would object to the use of the videotape.

The only possible way that it could be admitted would be to be admitted in part to talk about the single thing that I had asked him about, which is whether or not he had told the police about Mr.—about Mr. Penn sitting up, with blood on his cheek, prior to the time that he did the videotaped interview. And, basically, that was the only mention of the videotaped interview.

So with respect to the part in which he does obviously tell the detective about Mr. Penn sitting up, in the videotaped interview, that part might possibly be admissible; but the rest of it certainly is not admissible. And we object to the admission or the playing of that videotape interview in all or in part.

[PROSECUTOR]: Your Honor, as the Court recalls from the liminal motions, we basically conceded that we would not attempt to offer that statement as a hearsay statement since Mr. Hanson was available. However, as the Court is aware, under the rules of evidence, we are allowed to put into evidence prior consistent statements to rebut allegations of either lying or poor memory.

[Defense counsel], throughout his cross-examination, has implied—in fact, readily accused Mr. Hanson of being too drunk, too stoned to remember and, in fact, lying about what happened.

We are offering this statement as a consistent—prior consistent statement. And if the Court wants to enter a limiting instruction to the jury in that regard, we don't have a problem with that. But I think [defense counsel] has opened the door, and I would like to offer this statement at this time.

[DEFENSE COUNSEL]: I haven't opened the door to the entire statement. I offered the—at best, it's arguable, I may have opened the door to that portion of the statement of when he told the police officers that he saw Penn sitting up, with blood on his cheek. But he admitted telling—he admitted in court that he did say that on the videotaped interview and had not told the police officers that previously. And that's the only use of that videotaped interview. You're talking about a video interview that's a hearsay statement. It cannot be introduced as a prior consistent statement in total. He might be able to introduce little parts and pieces of it, but certainly not the entire thing, which is a re-enactment. Everything of what he said on the tape has not even been attacked, certainly, by prior inconsistent statements. The only thing that's really been attacked is whether or not he had told the police in the hospital that Penn was sitting up, with blood on his cheek.

[PROSECUTOR]: I think the entire statement should be allowed simply because of the attack on this witness's memory.

* * *

THE COURT: We're here, not in the presence of the jury.

[Defense counsel], do you have further comments on [the prosecutor's] argument that this is offered because you are attempting to attack Mr. Hanson's testimony as being fabricated?

[DEFENSE COUNSEL]: Your Honor, I'm—there are pieces of his testimony, particularly the only piece that I can remember that I attacked, as him not mentioning before, was Penn sitting up, with blood on his cheek. For that particular purpose, I think that possibly a prior consistent statement might be admitted. But he's already—he's already testified that he did, in fact, say that on the videotaped interview.

But I haven't opened up the door for the entire thing to come in. The entire thing talks about a lot of different things. It has character stuff on there. And if the Court would view that, it would be surprised by the length and by the amount of inadmissible testimony and character evidence which is on that videotaped interview. I'm not able to attack the videotaped interview at all. And, obviously, my cross-examination goes to attack the credibility of Mr. Hanson but certainly not what was in the videotaped interview. That thing should not be admitted under any circumstance. And I object to admission of that strenuously. I ask the Court to view it.

THE COURT: Mr. [Prosecutor], anything further?

[PROSECUTOR]: No, Your Honor; except I think the Court listened to the examination; and it's clear with the attempt to establish prior consistent statements, the challenge as to his state of mind, his intoxication, drunkenness, and use of marijuana, I think it's useful to show what this witness remembers and if what he is saying is truthful or what he is saying is fabricated.

* * *

[DEFENSE COUNSEL]: Your Honor, also, I would mention that it's not a prior consistent statement. There is not a prior consistent statement, because they are offering it to—its—it was well after the events. And they are offering it to bolster his testimony here today. So it's not a prior consistent statement, and it certainly is not under oath.

[PROSECUTOR]: I agree it's not under oath.

* * *

THE COURT: If court could come to order.

We are back. The jury is not present.

I have reviewed the tape. After having reviewed the tape, my decision is that the objection of [defense counsel] is overruled, and the State may—the tape may be played for the jury almost in its entirety. There is a part towards the end of the tape—there's just a few minutes or seconds left at the end of the tape, there's a pause, and Detective Kirkendall says, Were you in fear of your life. The tape should be stopped before that question is asked and answered. It's right toward the

end of the tape. And you might want to fast forward and find that. But there's an obvious pause, and then Detective Kirkendall asks that question.

\* \* \*

[PROSECUTOR]: Judge, I just—to clarify for the record, it's as a prior consistent statement. It's offered for purposes of rehabilitation not for the truth of the matter asserted. I misspoke that a little bit earlier during my argument.

THE COURT: And the defense, if they wish, may have a limiting instruction to that effect.

[DEFENSE COUNSEL]: We would request .a limiting instruction, Your Honor, although I don't have it right now. I didn't anticipate, frankly, that this statement was going to be admitted.

[¶ 20] These passages have been quoted at length to show the specific positions taken at trial in regard to the issues now before this Court. The State's arguments may be summarized as follows:

1. The videotape is offered as a prior consistent statement.

2. The videotape is offered for the purpose of rebutting allegations that Hanson either had poor memory as a result of intoxication and use of marijuana or he was lying.

3. The videotape is not offered to prove the truth of the matters asserted therein.

[¶ 21] In turn, the appellant's arguments are as follows:

1. The objection is fundamentally a hearsay objection.

2. The total videotape cannot be admitted as non-hearsay under W.R.E. 801(d)(1)(B) because the total videotape is not a prior consistent statement.

3. The total videotape contains much more than a possible consistent statement, including the fact that it is a re-enactment and that it contains "different things" such as "inadmissible testimony" and "character stuff."

4. The videotape is offered to bolster Hanson's trial testimony.

[¶ 22] In its appellate brief, the State defends the position taken by the prosecutor that a general attack on a trial witness's credibility is sufficient to invoke W.R.E. 801(d)(1)(B), citing *Humphrey*, 962 P.2d at 871–72, *Curl*, 898 P.2d at 374, and *Mitchell v. State*, 865 P.2d 591, 600 (Wyo.1993). A review of these cases reveals that they do, indeed, countenance this rather broad interpretation of the use of prior consistent statements. The appellant contends that it is "ludicrous" to interpret W.R.E. 801(d)(1)(B) in this fashion because such an interpretation would allow litigants to make a videotape of all witnesses, and then, when each witness is cross-examined, play the videotape for the jury. The outcome, according to the appellant, would be a battle of videotapes made to rehabilitate witnesses before the trial begins.[7]

[¶ 23] We have detailed the parties' trial court contentions in order to compare them to the arguments made on appeal. This step is necessary because this Court generally will not consider issues which are raised for the first time on appeal unless they are jurisdictional or of a fundamental nature. *Bell v. State*, 994 P.2d 947, 957 (Wyo.2000). Consequently, we must next determine whether the appellant's stated issues on appeal are the same as those he raised at trial.

[¶ 24] In his appellate brief, the appellant finds fault with the admission of the videotape on three grounds: (1) the videotape is

---

**7.** Not all jurisdictions follow Wyoming's approach to this issue. Some courts contend that admitting prior consistent statements whenever a witness is subject to general impeachment has the effect of negating the requirement for an allegation of recent fabrication or improper motive. *See Keller v. State*, 586 So.2d 1258, 1259–60 (Fla.App.1991); *State v. Mensing*, 297 Mont. 172, 991 P.2d 950, 953 (1999); and Annotation, *supra*, 58 A.L.R.4th 1014 at 1029–35. Absent an allegation of recent fabrication or improper motive, admitting prior consistent statements merely bolsters the witness's in-court testimony. *Fields v. Com.*, 12 S.W.3d 275, 280 (Ky.2000). Such statements are self-serving and cumulative. *Harris v. State*, 339 Ark. 35, 2 S.W.3d 768, 770 (1999). Trial by re-enactment could result. *Pickren v. State*, 269 Ga. 453, 500 S.E.2d 566, 570 (1998).

an inconsistent, rather than a consistent, statement; (2) prior consistent statements should not be admissible where there has only been general impeachment as to credibility rather than an allegation of recent fabrication or improper motivation; and (3) the videotape violated W.R.E. 403 in that it was more prejudicial than probative. We find that, though they are stated somewhat differently than stated by trial counsel, these are the same issues raised at trial.[8]

[¶ 25] Resolution of the specific question before this Court—whether the videotape should have been admitted—must begin with a recognition that the videotape does not meet the definition of "statement" found in W.R.E. 801(c) as interpreted by *Humphrey,* 962 P.2d at 871; *Kolb,* 930 P.2d at 1245; and *Johnson v. State,* 930 P.2d 358, 363 (Wyo.1996). The videotape is not a " 'single declaration or remark.' " *Humphrey,* 962 P.2d at 871 (*quoting Kolb,* 930 P.2d at 1245). There was no attempt to "break down the narrative and determine the separate admissibility of each 'single declaration or remark.' " *Kolb,* 930 P.2d at 1245 (*quoting Phillips,* 461 S.E.2d at 91). Indeed, the videotape is not even limited to being the "report or narrative" of Hanson. It is, in the main, a re-enactment of the crimes, done to show how the crimes were committed. This is certainly more than a consistent statement introduced only to rebut impeachment of credibility.[9]

[¶ 26] The second problem with the admission of the videotape is that the trial court did not engage in any analysis under W.R.E. 403 to determine whether the videotape was more probative than it was unfairly prejudicial. The State offered the videotape for the limited purpose of rehabilitation; that is, it was offered as proof that Hanson's in-court testimony should be believed because

he had made a consistent statement in the past. In making the offer of the videotape, however, the prosecutor made no effort to identify anything in particular contained on the videotape that was consistent with anything in particular from Hanson's in-court testimony. Surely, if a statement is to be admitted into evidence because it is consistent with in-court testimony, the trial court must make the preliminary determination that the statements are, indeed, consistent. This requires some amount of specificity. That did not happen here. We are left to speculate as to the probative value of statements that have not been identified.

[¶ 27] The same deficiency exists with regard to the lack of any analysis of the videotape's potential for unfair prejudice. In a case involving the admissibility of a videotape of a defendant's statement to the police, the Supreme Court of Georgia approved introduction of the videotape, but only because of the trial court's careful exercise of its discretion:

> Where evidence is challenged on the ground that its probative value is outweighed by its tendency to unduly prejudice the jury, the trial court must exercise its discretion in determining admissibility. *Smith v. State,* [255 Ga. 685, 341 S.E.2d 451 (1986) ]. We find no abuse of discretion in this instance.... The trial court went through each page of a transcript of the videotaped interview before it was heard by the jury and made separate rulings regarding each statement that defendant found objectionable. The court properly required the prosecution to edit the tape to remove material that was irrelevant or that put appellant's character in issue. The court committed no error.

---

8. The State argues that no objection was made at trial based on an unfair prejudice concept under W.R.E. 403 and that, therefore, plain error analysis is required. *See Delacruz v. State,* 10 P.3d 1131, 1132 n. 1 (Wyo.2000). Trial counsel's interrelated arguments that the "total" videotape went beyond a consistent statement, and that the videotape contained inadmissible testimony and character evidence can be seen as the equivalent of that argument, even though counsel did not specifically cite W.R.E. 403, and we choose to

accept it as such. Trial counsel also argued that the appellant was prejudiced by his inability to cross-examine the videotape.

9. Interestingly enough, while the prosecutor assured the trial court that the videotape was introduced solely for rehabilitation, the State in its appellate brief opined as how the videotape "was relevant to explain to the jury exactly how the attack occurred...."

*Carroll v. State,* 261 Ga. 553, 408 S.E.2d 412, 413 (1991). Nothing resembling this process took place in the instant case. While the trial judge did view the videotape prior to making a ruling, the record does not reflect that he identified any statement or statements that he found to be consistent, or that he determined the relative probative value of such statements, or that he determined the potential for unfair prejudice if such statements were admitted.

[¶ 28] We can only conclude that it was error for the trial court to admit this videotape into evidence. That conclusion leads to the ultimate question of whether such error requires reversal of the appellant's convictions. W.R.A.P. 9.04 provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court." W.R.Cr.P. 52(a) and W.R.E. 103(a) are substantially similar. The test for "harmless error," stated in its reverse sense, is as follows:

"An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. To demonstrate harmful error, the defendant must show prejudice under 'circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play.' *Johnson v. State,* 790 P.2d 231, 232 (Wyo.1990)."

*Skinner v. State,* 2001 WY 102, ¶ 25, 33 P.3d 758, 767 (Wyo.2001) (*quoting Solis,* 981 P.2d at 36). The appellant has the burden of proving that an error has been prejudicial. *Spilman v. State,* 633 P.2d 183, 185 (Wyo. 1981).

[¶ 29] There is no reasonable possibility that the appellant in the instant case would have been acquitted absent introduction of the videotape. The videotape was merely cumulative to the voluminous evidence produced by the State that tended to prove the appellant's guilt. *See Curl,* 898 P.2d at 374. Another videotape of the appellant's apartment, showing Penn's deceased body and the bloody crime scene, was introduced into evidence. Numerous photographs, crime scene schematics, medical reports and Penn's autopsy report went to the jury. The testimony by both of the apartment managers as to the immediate aftermath of the crimes corroborated Hanson's version. Several of the appellant's knives and the rifle were admitted. The business records showing the appellant's purchase of the rifle came into evidence. In short, there was a massive amount of evidence incriminating the appellant.

[¶ 30] Other circumstances tended to reduce or eliminate any unfairly prejudicial effect that the videotape might have had. The videotaped witness, Hanson, testified at trial and was subject to cross-examination as to both his trial testimony and the videotape. In addition, the jury's consideration of the videotape was strictly limited by the accompanying cautionary instruction. Beyond that, there was an insufficient identification by the appellant, both at trial and in this appeal, of the specific portion or portions of the videotape that he contended created unfair prejudice. Under the particular circumstances of this case, the appellant has not met his burden of proving that admission of the videotape resulted in prejudicial error.

**WHETHER THE PROSECUTOR COMMITTED PROSECUTORIAL MISCONDUCT WHEN HE ELICITED FROM WITNESSES (1) A COMMENT ON APPELLANT'S RIGHT TO REMAIN SILENT, (2) VICTIM IMPACT STATEMENTS, AND (3) COMMENTS ON APPELLANT'S VERACITY?**

We have twice recently reiterated the appropriate standard for review of claims of prosecutorial misconduct:

"Prosecutorial misconduct "has always been condemned in this state." *Valerio v. State,* 527 P.2d 154, 156 (Wyo.1974). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error ... affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10;

*and see e.g., Jones v. State,* 580 P.2d 1150, 1154 (Wyo.1978). Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused. *Jones v. State,* 735 P.2d 699, 703 (Wyo.1987). We read this standard to be in consonance with the standard followed by the United States Supreme Court[.]"

*Earll v. State,* 2001 WY 66, ¶ 9, 29 P.3d 787, 789–90 (Wyo.2001). *See also Warner v. State,* 2001 WY 67, ¶ 18, 28 P.3d 21, 27 (Wyo.2001).

[¶ 32] The burden of establishing prosecutorial misconduct rests upon the appellant who raises the issue. *Taylor v. State,* 2001 WY 13, ¶ 19, 17 P.3d 715, 722 (Wyo.2001). Because there were no objections at trial to any of the three alleged violations in the instant case, our analysis here will be under the plain error standard. The appellant must show that the record clearly reflects an error that transgressed a clear and unequivocal rule of law, and that such error materially prejudiced a substantial right of the appellant. *Id.* at ¶ 16, 17 P.3d at 721; *Seymour v. State,* 949 P.2d 881, 883 (Wyo.1997).

### COMMENT ON THE RIGHT TO SILENCE

After the incident with Hanson and Penn, the appellant left the Star Apartments. Law enforcement officers in the Casper area began to look for him. While on routine patrol early the following morning, an Evansville police officer noticed a man later identified as the appellant walking down a roadway. Having in mind the homicide report from the previous evening, the officer contacted the man. On direct examination, the officer testified as follows:

Q. Okay. So what, if anything, did you do, Officer?

A. Once I observed the male and I pulled up next to him, he was walking. He had his head down. He looked over at me, and he turned his head quick back to look at the ground. I rolled down my window, and I attempted to contact the male, where I began to ask him questions: Are you okay? Is everything all right? *And he ignored me or at least I felt he ignored me. He didn't respond to me at all.* I drove past him. I turned my vehicle around again. I attempted to contact him a second time, where I asked him similar questions: Where are you headed? Where are you coming from? And he responded.

Q. And what, if anything, did he tell you?

A. I asked him if—if everything was okay. And he said, Yes. I asked him if he lived in Casper. And he said, Yes. I asked him where he was coming from. He said, Casper.

Talking to the male, I observed his clothing was soaked. He was soaken [sic] from head to toe. His skin, in my opinion, was very pale looking, as if he had been out for a long period of time. He was cold. He acted like he was cold. His hands were in his pockets. And he was more or less shriveled up, you know, as he was walking. Concerned about his demeanor, his character, I asked if everything was okay. And he said, Yes. He asked me if I—

Q. What kind of clothing was he wearing?

A. Pardon me, sir?

Q. What kind of clothing was he wearing?

A. He was wearing what appeared to be a plaid shirt or an overcoat, like a flannel shirt, with khaki, tan pants.

Q. Now, I interrupted you. You started to say he asked you—what did he ask you?

A. He asked me if I knew where the interstate was at, at which time I pointed. The interstate is south, and I gave the direction.

Q. Did you make any attempt to determine if this was the individual being sought by the Casper Police Department?

A. I did. I contacted the Casper Police Department via my dispatch to contact their dispatch. And I was advised, with

the description I gave them, that this was not the guy they were looking for.

Q. Because the clothing didn't match or what?

A. Because the clothing didn't match. They said it was similar but not the same.

Q. All right. So then what did you do?

A. I advanced forward, continued driving on Lathrop Road probably at 1, 2 miles an hour. As I was watching my rearview mirror, I saw the gentleman run across the street to a road called Elkhorn Road, which is a dirt road, and he began walking that.

Q. Heading towards the interstate?

A. Heading towards the interstate.

Q. So what did you do then?

A. I then turned my patrol vehicle around, further up towards the Lathrop Feed and Equipment, and I went back to make contact with the gentleman for a third time.

Q. Okay. *Did you have some suspicions or concerns?*

A. Yes.

Q. And what was that?

A. Based on the fact that he ran across the road; and from the first attempt where I tried to contact him and he—*I felt that he ignored me, I felt that was suspicious.* The fact that his clothing was soaked and that his skin was pale, I was concerned. I didn't understand what where the guy had been, so I wanted to gain more information.

(Emphasis added.)

 [¶ 34] The appellant contends that the emphasized portions of the officer's testimony were improper comments on his right to remain silent. He cites to *Tortolito v. State*, 901 P.2d 387, 390 (Wyo.1995) (footnote omitted), where we said:

Since the right to remain silent is a self-executing right, an accused is presumed to be exercising the right by his silence, pre-arrest and pre-*Miranda* when questioned by the state's agents for purposes of a

criminal investigation. Accordingly, the prosecutorial use of the citizen's silence to infer the guilt of the citizen is constitutionally prohibited.

Prosecutorial violations are subject to the *Clenin [v. State*, 573 P.2d 844 (Wyo. 1978) ] rule's mandate that failure to respect the constitutional right of the citizen-accused not to have his silence called to the jury's attention will entitle the accused to a reversal of conviction.

 [¶ 35] In *Tortolito*, we reinvigorated *Clenin's* reliance on the Wyoming Constitution's prohibition against self-incrimination rather than on due process analysis in "right to silence" cases, and we extended that protection to pre-arrest silence.[10] *Tortolito*, 901 P.2d at 389–91. We continued to recognize, however, that a "reference to silence which is not a 'comment' will not be reversed absent a showing of prejudice." *Id.* at 390. A "reference" to silence is a "comment" upon the exercise of the right to silence when it is "used to the state's advantage either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." *Id.* at 391.

 [¶ 36] We continue to adhere to the specific rule of *Tortolito;* that is, prosecutorial comment upon a defendant's pre-arrest exercise of his constitutional right to remain silent is reversible error. Nevertheless, we find that the facts of *Tortolito* are not similar to the facts of the instant case, and we also find that the *ratio decidendi* of *Tortolito* does not apply in this case. In *Tortolito*, the defendant was identified to the police as having committed a robbery. Following those accusations, officers detained and interrogated Tortolito. Tortolito "remained silent" in the face of those accusations. In direct examination of the officers, the prosecutor elicited numerous statements about Tortolito's failure to respond to the allegations, and in closing argument, the prosecutor characterized Tortolito's silence as an admission of guilt. *Id.* We found reversible error in these circumstances:

**10.** Wyo. Const. art. 1, § 11: "No person shall be compelled to testify against himself in any crimi-

nal case. . . ."

Under the erroneous view that no constitutional right to pre-arrest silence exists, a citizen who stands mute in the face of accusatory interrogation about the crime during a law enforcement investigation and inquiry is without constitutional protection against law enforcement personnel who treat silence as probative evidence of guilt. Law enforcement personnel can time the citizen's arrest to occur after the citizen stands mute in the face of the accusation. This practice, which encourages manipulative timing of arrests, does not serve the constitutional provision's purpose of protecting the right to silence during pre-arrest, accusatory interrogation by the state's agents. Permitting prosecutorial use of that silence discourages a law enforcement system's reliance upon extrinsic evidence independently secured through skillful investigation and, instead, encourages reliance upon compulsory self-disclosure. *See Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964).

*Tortolito*, 901 P.2d at 390.

[¶ 37] In making his "right to silence" argument in his appellate brief, the appellant quoted only the two specific questions and answers from the arresting officer's testimony in which the emphasized responses occurred: "And he ignored me or at least I felt he ignored me. He didn't respond to me at all." "I felt that he ignored me, I felt that was suspicious." We have set out more of the officer's testimony to show the totality of the circumstances in which these words were spoken.[11] This was not a case where, faced with the accusations of investigating officers, the appellant made no response, only to have his silence used against him at trial as evidence of guilt. Instead, the fact that the appellant initially ignored the officer and failed to respond to him was presented in direct testimony simply as part of the circumstances under which the officer first encountered the appellant. It is significant that the questions and answers had nothing to do with the crime itself. It is also significant that, unlike in *Tortolito*, the prosecutor did not mention in opening or argue in closing that the appellant's silence somehow proved guilt.

[¶ 38] There are many situations where, without reversible error, evidence may be adduced that a defendant "remained silent" at some point. Since *Tortolito*, we have had occasion to note several such situations: *Shipman v. State*, 2001 WY 11, ¶ 5, 17 P.3d 34, 36 (Wyo.2001) (officer testified that, at murder scene, the defendant said that he "did not want to say anything else"); *Robinson*, 11 P.3d at 373 (prosecutor noted what the defendant "left out" when he made a statement to the police); *Beartusk*, 6 P.3d at 144 (officer testified that, after answering some innocuous questions, the defendant indicated he did not wish to answer any more questions); *Helm v. State*, 1 P.3d 635, 640–41 (Wyo.2000) (prosecutor noted there was a lack of expert testimony to support the defendant's theory); and *Emerson v. State*, 988 P.2d 518, 522 (Wyo.1999) (prosecutor noted facts the defendant did not include in his statements).

[¶ 39] A prosecutor does not "comment" on a defendant's exercise of his right to silence where he does not attempt to use the silence to the state's advantage, where he does not argue to the jury that the silence was evidence of guilt or an admission of guilt, and where the defendant does not show any prejudice. *Shipman*, 2001 WY 11, ¶ 24, 17 P.3d at 39. Material prejudice is shown only where there is a reasonable possibility that the verdict would have been more favorable to the defendant if the evidence or prosecutorial comment had not been allowed. *Emerson*, 988 P.2d at 522. In analyzing right to silence cases, we will not single out or take words and phrases out of context. *Robinson*, 11 P.3d at 373. We will consider whether the prosecutor asked improper questions, whether he emphasized or followed up on the silence issue, and whether he attempted to exploit the issue in any way. *Beartusk*, 6 P.3d at 144.

---

11. The officer's direct examination description of his initial contacts with the appellant, from the time he first saw the appellant until the appellant agreed to sit in the police car, takes up twelve pages of the trial transcript.

[¶ 40] In the case now before this Court, an Evansville police officer not directly involved in the murder investigation being conducted by the Casper Police Department, but knowing of the murder, happened to come across the appellant in somewhat unusual circumstances—walking along a dirt road in a rural area at about 6:00 a.m. In describing the suspicious nature of his encounter with the appellant, the officer testified as to the appellant's appearance and conduct, as well as what the appellant said. None of this was elicited from the officer as a comment on the appellant's exercise of his right to remain silent; rather, it was all part of the officer's explanation for his continuing contact with the appellant. Further, given all of the evidence against the appellant, there is no reasonable possibility that, absent this evidence, the verdict would have been more favorable to the appellant. Prejudicial error did not occur.

### Victim Impact Statements

[¶ 41] The appellant was convicted of killing Penn and attempting to kill Hanson. Hanson suffered a gunshot wound and numerous knife wounds. During his direct examination, Hanson described the effect of his many injuries:

Q. How long did it take you to recover, physically, from what had happened to you?

A. Oh, probably two—probably two or three weeks, I imagine, at least. I was in the hospital for five days. I was on morphine for three days. You know I was—I couldn't move for two days.

Q. What has been the emotional fallout from this incident for you?

A. It's been terrible. I mean, it's—it's unbelievable how bad it is. I mean, it's done—you just don't think stuff like that is going to happen.

In addition, Hanson's treating physician testified as follows:

Q. ... Doctor, to your knowledge, Mr. Hanson has recovered physically from the wounds inflicted?

A. I have very little knowledge. I saw him a couple of weeks afterwards in my office, and I haven't seen him since. I know he's obviously here today.

Q. All right. And I guess one final question. And the jury has seen Mr. Hanson reference some scarring that has remained from surgery and from the stab wounds themselves and the slicing cuts. Is that consistent, from your medical training and experience, with long-lasting effects he'll have from these injuries?

A. Oh, the scars will resolve a little bit more; but by, basically, a year, that's basically what he's going to have; yes.

[¶ 42] The appellant characterizes this testimony as inadmissible victim impact statements, offered for the sole purpose of garnering sympathy for Hanson. His plain error argument is that the admission of this evidence violated a clear rule that irrelevant evidence is not admissible, and that its prejudicial effect upon the appellant is "obvious" where the primary issue was the credibility contest between Hanson and the appellant. In *Hernandez v. State*, 976 P.2d 672, 676 (Wyo.1999), we described the process of reviewing claims of this nature:

Before evidence can be admissible, it must be relevant. W.R.E. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. In criminal cases, "[e]vidence is always relevant if it tends to prove or disprove one of the elements of the crime charged." *Grabill v. State*, 621 P.2d 802, 809 (Wyo.1980). *See also Geiger v. State*, 859 P.2d 665, 667 (Wyo.1993).

Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." W.R.E. 403. Victim impact testimony must not be permitted "unless there is a clear justification of relevance." *Justice v. State*, 775 P.2d 1002, 1011 (Wyo. 1989). For this Court to conclude that the trial court admitted unduly prejudicial evidence in violation of W.R.E. 403, [the appellant] must demonstrate "that the evidence had little or no probative value and that it was extremely inflammatory or in-

troduced for the purpose of inflaming the jury." *Apodaca v. State*, 627 P.2d 1023, 1027 (Wyo.1981). *See also Geiger*, 859 P.2d at 668.

[¶ 43] The charge in *Hernandez* was aggravated assault with a deadly weapon. We found in that case that, though some of the individual questions and answers "might have been irrelevant," the testimony at issue describing the pain and problems suffered by the victim after a stabbing was relevant as proof that the defendant inflicted bodily injury with a deadly weapon, one of the elements of the crime charged. *Hernandez*, 976 P.2d at 676. The *Geiger* case cited in *Hernandez* involved a charge of attempted murder. In *Geiger*, under a plain error analysis, we concluded that victim impact testimony describing the victim's injuries, his feelings at the time, and his remarks concerning a potential civil action against the defendant were relevant as proof of the element of intent to kill. *Geiger v. State*, 859 P.2d 665, 668 (Wyo.1993).

[¶ 44] In *Justice v. State*, 775 P.2d 1002, 1010–11 (Wyo.1989), another case cited in *Hernandez*, we addressed victim impact evidence that was not found to be relevant:

It is clear that the testimony offered by the victims of this crime with respect to how it affected them in connection with their lives after the crime is absolutely irrelevant with respect to the issues before the jury. Their discussion of the impact of the crime upon them could not in any way serve to establish any of the elements of the crime of aggravated robbery. The only purpose must have been to attempt to arouse the passions of the jury. Consequently, we are satisfied that the admission of such evidence is error, and the trial courts are cautioned not to permit such evidence to be presented unless there is a clear justification of relevance. In the context of this case, however, we are persuaded that such evidence was harmless. Given the other evidence against Justice, which the trial court aptly described as overwhelming, the admission of the testimony about the impact on the victims did not constitute prejudicial error. *See Hyde v. State*, 769 P.2d 376 (Wyo.1989); *Ortega v. State*, 669 P.2d 935 (Wyo.1983).

[¶ 45] Applying these standards to the facts of this case, we conclude that the questioned testimony is quite similar to that involved in *Hernandez*, in that, while some of it "might be irrelevant," the testimony in totality is relevant to the issue of whether the appellant intended to kill Hanson. The two questions to Hanson, and his answers, and the two questions to the treating physician, and his answers, are actually a small part of lengthy testimony about Hanson's injuries. The direct examination of Hanson just prior to that quoted above went as follows:

Q. And then you had surgery?

A. Yeah. I had made—I got scars from here to here. Yeah.

Q. Do you know how many times you were stabbed?

A. I got one big one that goes down here, one that goes across here. I got one—stab wounds here, plus this. I got stab wounds in my shoulder. I'm—I don't know how many. I got stabbed here.

Q. You're pointing above your left eye?

A. Yeah. Right here. There is a big scar—I've still got a big knot there. I got stabbed in the head a few times, a bunch of times.

Q. How long were you in surgery; do you know?

A. I was in—the next thing—I woke—I don't know. I would say two or three hours, probably. He had to sew up—my larynx was cut in half; my liver, he put some stitches in it. My lung was nicked, and a bunch of stuff like that.

[¶ 46] As part of this examination, in the context of the charge of attempted murder, the prosecutor's question to Hanson as to how long it took to recover from his injuries did not seek irrelevant information. While the topic of the next question—the "emotional fallout" from the incident—was irrelevant, we find that it was not unduly prejudicial to the appellant, given the nature and amount of other evidence. The same can be said of the questions to the doctor and his answers. Testimony about scarring from the many wounds may be seen as relevant, although not particularly probative, on the

issue of an attempt to kill. The long-lasting effect of that scarring is probably not relevant, but neither was it unduly prejudicial. These two questions to the doctor followed lengthy questioning as to the nature and location of Hanson's injuries. This testimony was detailed and graphic, and was surely much more damaging to the appellant than any mention of scarring. The first substantive question posed to the doctor, and his answer, may suffice to reveal the context in which the "scarring" questions were asked:

Q. Would you tell the jury, if you would, how Mr. Hanson was presented to you and what the nature of his injuries were as you observed them first.

A. He was in the emergency room when I arrived there. At that time, he was seen to be covered in blood from—literally from the top of his head down to his knees. He had a number of knife wounds and stab wounds. He had one on the right forehead; had a couple on his neck; a deeper one on the right side of the neck, just below the angle of his jaw. He had one, I believe, on his right shoulder. There were two large stab wounds in the lower chest area. And he had a gunshot wound to the left neck, the base of the left neck.

With such testimony before the jury, there is no reasonable possibility that the brief testimony about long-term scarring or the emotional impact of Hanson's injuries had any effect upon the verdict.[12]

### COMMENTS ON THE APPELLANT'S VERACITY

[¶ 47] During his direct examination of Hanson, the prosecutor twice asked whether Hanson believed something the appellant had said while Hanson, Penn, and the appellant were sitting in the appellant's apartment before the attack:

Q. Okay. What was the nature of the conversation?

A. Mr. Lancaster was telling us—I don't know. He was telling us a story about being in the armed forces and stuff like that—

\* \* \*

Q. *Did you believe his stories?*

A. No, I didn't. I just—

\* \* \*

Q. And what did the knives look like and where were they?

A. The—the knife he—the one knife was a big knife, real big knife. And it was hanging in a sheath behind the couch. And it had some holes in it, in the blade. And he was saying—another story, I think. He was saying that he made that knife. And he—

Q. *And you didn't believe him?*

A. No, not really.

(Emphasis added.)

[¶ 48] The appellant complains that these questions violated the principle that forbids one witness from commenting on the credibility of another witness. It is true that we have long accepted this rule of law:

This Court has consistently recognized that it is the jury's duty to resolve the factual issues, judge the credibility of the witnesses, and determine the guilt or innocence of a criminal defendant. *Gayler v. State*, 957 P.2d 855, 860 (Wyo.1998); *Zabel v. State*, 765 P.2d 357, 362 (Wyo.1988). A witness may not, therefore, comment on the veracity or truthfulness of another witness. *Gayler*, 957 P.2d at 860; *Curl v. State*, 898 P.2d 369, 373–74 (Wyo.1995).

*Huff v. State*, 992 P.2d 1071, 1079 (Wyo. 1999). "Like opinions as to guilt, opinions as to the veracity, or lack thereof, of the victim or defendant are fundamentally objectionable if those opinions have the capacity to decide the case *for* the jury." *Curl*, 898 P.2d at 374 (emphasis in original).

[¶ 49] There are instances, however, where testimony that appears to comment on another witness's credibility may not be objectionable. For that reason, "we must look carefully at the question asked and the testimony elicited to determine whether a witness actually made an improper comment about another witness' credibility." *Huff*, 992 P.2d at 1079. For instance, "testimony assisting the jury in understanding some as-

---

12. The discussion herein is not relevant to the admissibility at sentencing of victim impact state-

ments pursuant to Wyo. Stat. Ann. §§ 7–21–101 through 7–21–103 (LexisNexis 2001).

pect of the testimony of another witness that does not comment directly on that witness' credibility or veracity is not invasive of the role of the jury." *Saldana v. State*, 846 P.2d 604, 618 (Wyo.1993). Testimony that merely has the collateral effect of supporting or denigrating another witness's credibility is not objectionable on that basis. *Id.; Curl*, 898 P.2d at 374.

[¶ 50] There were no objections to this testimony at trial, so we review the record for plain error. *Huff*, 992 P.2d at 1078–79. We defer to the sound discretion of the trial court, reversing only where there has been an abuse of that discretion. *Saldana*, 846 P.2d at 618. An abuse of discretion occurs when the trial court "exceeds the bounds of measured reason in light of those matters properly before that court." *Curl*, 898 P.2d at 373. Finally, as part of his plain error burden, the appellant must demonstrate that a substantial right has been denied to him, as a result of which he has been materially prejudiced. *Huff*, 992 P.2d at 1079 (*quoting Bradley v. State*, 635 P.2d 1161, 1164 (Wyo.1981)).

[¶ 51] A narrow view of this issue would be that the only direct comment on another witness's credibility is a statement that "he told the truth" or "he lied." Such a view is too narrow. Surely, testimony that "I believed him" or "I didn't believe him" is just as much a comment on credibility. Unless the fact of this belief or disbelief is independently relevant to the issues to be determined by the jury, it is difficult to conclude that such testimony is admissible.[13]

[¶ 52] This Court cannot perceive anything in the record that supports the prosecutor's having asked Hanson these two credibility questions. Whether the appellant had been in the armed forces, or whether he had made the knife, did not matter. Whether Hanson believed the appellant had been in the armed forces, or whether Hanson believed the appellant had made the knife, did not matter. This information did not have a tendency to prove or disprove any element of

a charged crime or a defense. The questions should not have been asked, and, had there been an objection, such should have been sustained.

[¶ 53] The conclusion that this evidence should not have been admitted, however, is not the same as concluding that reversible error occurred. There is no reasonable possibility that these brief comments on an immaterial issue in any way affected the jury's verdict. As we have pointed out several times already, the State presented a huge amount of evidence against the appellant. In addition, Hanson was fully subject to cross-examination as to the conversation during which the subjects of the armed forces and making the knife arose. The error was harmless.

## WHETHER DEFENSE COUNSEL'S FAILURE TO MOVE TO SUPPRESS EVIDENCE SEIZED DURING AN ILLEGAL SEARCH OF APPELLANT RENDERED COUNSEL'S ASSISTANCE INEFFECTIVE?

FACTS

[¶ 54] We have already quoted at length from the arresting officer's trial testimony in describing his initial contacts with the appellant. Those contacts resulted in the appellant's arrest after the officer determined the appellant's identity by checking the driver's license in the appellant's wallet. The appellant now contends that his trial counsel was ineffective in not moving to suppress all statements and evidence obtained as a result of the officer's search of his wallet. The appellant's argument focuses on the following portion of the officer's testimony, which takes up after the officer got out of his vehicle to talk to the appellant:

Q. What happened then?

A. We had a brief conversation about his well-being, and I asked him if he would like to warm up inside my patrol car.

Q. And what was the conversation then?

---

13. For instance, in a civil action where detrimental reliance is an element of a cause of action, the

fact of belief may be directly at issue.

A. He said, Okay. I asked him if he would advance forward, place his hands on my car. I told him that he wasn't under arrest, and I wasn't going to take him to jail. But as my policy indicates, before I place somebody in my patrol car, I have to—I have to pat them down, for safety issues, make sure there is no weapon they are going to harm me with, make sure there is no weapon they are going to harm themselves with once they get inside my car.

Q. Did you inquire of him whether he had any weapons?

A. Yes.

Q. And what did he tell you?

A. He didn't—he didn't verbally say anything. He did place his hands on my car, and he did allow me to check.

Q. And did you find any weapons on him?

A. Yes. As I began to check, I started with his left side. And as I got down towards his shoulder and the base of the coat, the outer coat, as I attempted to reach in, he moved his arm. I asked him to place his hands back on the car, which he did. Do not—if there's something in there, let me remove it. I'll show you what it is, and I'll place it in front of you. As I entered into his pocket, I did pull out what appeared to be a knife.

Q. Did you find any other weapons on his person?

A. I did.

Q. And what was that?

A. On his right side, in the same pocket—excuse me—not the same pocket, but the pocket on the other side, I pulled out another knife.

Q. Okay. Did you make any attempt to find any identification of this individual?

A. Yes, I did.

Q. And what was that?

A. I found—I located his wallet in his rear pocket, at which time I set it on the hood of my car so that he would know that the contents in his wallet was safe.

Q. Did you ever ask him his identity during the earlier time that you were speaking with him?

A. Yes.

Q. What, if anything, did he tell you?

A. He identified himself as Norman.

Q. Okay. Did you make any attempt, yourself, to look at the wallet to determine identification?

A. I did.

Q. And what was the identification contained in that wallet?

A. His driver's license said his name was James Norman Lancaster.

Q. Was that the name that had been given to you by the Casper Police Department?

A. It was.

[¶ 55] The appellant contends that this warrantless search of his wallet was not justified by any exception to the constitutional requirement for a warrant. Further, he insists that, without the warrantless search, the State would not have obtained a New Mexico identification card that linked him to the purchase of the rifle.

### STANDARD OF REVIEW

[¶ 56] The standard for appellate review of a claim of ineffective assistance of counsel is the same under the state and federal constitutions. *In Interest of LDO,* 858 P.2d 553, 556 (Wyo.1993). As we stated in *Eustice v. State,* 11 P.3d 897, 901–02 (Wyo.2000) (*quoting Beadles v. State,* 984 P.2d 1083, 1085–86 (Wyo.1999)), such claims are reviewed under the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a

breakdown in the adversary process that renders the result unreliable."

[¶ 57] In reviewing claims of ineffective assistance of counsel, we invoke a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment. *Eustice*, 11 P.3d at 902 (*quoting Beadles*, 984 P.2d at 1085–86); *Sorensen v. State*, 6 P.3d 657, 660 (Wyo.2000), *cert. denied*, 531 U.S. 1093, 121 S.Ct. 818, 148 L.Ed.2d 702 (2001) (*quoting Jackson v. State*, 902 P.2d 1292, 1295 (Wyo.1995)). " '[T]he paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance.' " *Sorensen*, 6 P.3d at 660 (*quoting Jackson*, 902 P.2d at 1295). *See also Herdt v. State*, 891 P.2d 793, 796 (Wyo.1995). The burden of proving ineffective assistance of counsel rests with the appellant. *Sorensen*, 6 P.3d at 660.

[¶ 58] The failure to file a suppression motion does not constitute ineffective assistance of counsel *per se*. *Bloomquist v. State*, 914 P.2d 812, 821 (Wyo.1996); *Dickeson v. State*, 843 P.2d 606, 610 (Wyo. 1992). Instead, the reasonableness of counsel's action or inaction is evaluated from the perspective of counsel at the time and in light of all the circumstances of the case. *Bloomquist*, 914 P.2d at 821; *Dickeson*, 843 P.2d at 610. For instance, where counsel fails to move to suppress his client's statement, and that failure is based on counsel's failure to investigate and discover a *Miranda* violation that likely would have made the statement inadmissible, such failure is ineffective assistance of counsel. *In Interest of LDO*, 858 P.2d at 559. However, where the decision not to file a motion to suppress is part of counsel's trial strategy, "it will not, in hindsight, be judged as unconstitutionally ineffective assistance of counsel." *Hornecker v. State*, 977 P.2d 1289, 1292 (Wyo.1999); *Den-*

*nis v. State*, 963 P.2d 972, 977 (Wyo.1998). Furthermore, ineffective assistance of counsel is not shown where counsel had no defense to present. *Munden v. State*, 698 P.2d 621, 624 (Wyo.1985). In particular, counsel is not ineffective for failing to pursue a motion to suppress where there is no underlying justification for the motion. *Beadles*, 984 P.2d at 1086; *Starr v. State*, 888 P.2d 1262, 1266 (Wyo.1995), *overruled on other grounds sub nom. Jones v. State*, 902 P.2d 686 (Wyo. 1995).

[¶ 59] The second element of the *Strickland* test for ineffective assistance of counsel, assuming counsel's deficient performance has been shown, is proof that prejudice to the appellant resulted. This requires a showing of the existence of "a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different." *Herdt*, 891 P.2d at 799; *Starr*, 888 P.2d at 1266. In the case of a failure to seek suppression of inadmissible evidence, prejudice will result where, in the absence of that evidence, "only a limited amount of evidence was available to the prosecution to support a conviction." *Dickeson*, 843 P.2d at 612.

## DISCUSSION

[¶ 60] The allegation underlying the claim of ineffective assistance of counsel in this case is that trial counsel failed to move to suppress the statements and evidence obtained as a result of the arresting officer's search of appellant's wallet.[14] The focus of our inquiry, then, is the law of search and seizure as it relates to such incidents of police-citizen contact.[15]

[¶ 61] Neither the federal nor the state constitution forbids *all* searches and seizures; rather, they prohibit *unreasonable* searches and seizures. *Guerra v. State*, 897 P.2d 447, 452 (Wyo.1995). War-

---

14. Counsel did object to the admission of statements made by the appellant, but on discovery grounds rather than those raised here. A hearing on that objection occurred outside the presence of the jury. Thus, the trial court was able to rely upon, and the record contains, the arresting officer's testimony from this hearing and his in-court testimony.

15. The appellant has made no effort to pursue a separate state constitutional analysis of this issue, so we will follow his lead. *See Vasquez v. State*, 990 P.2d 476, 482–89 (Wyo.1999); *Gronski v. State*, 910 P.2d 561, 565 (Wyo.1996); and *Wilson v. State*, 874 P.2d 215, 219 (Wyo.1994).

rantless searches and seizures are unreasonable *per se,* with but a few exceptions. *Gehnert v. State,* 956 P.2d 359, 362 (Wyo.1998); *Morris v. State,* 908 P.2d 931, 935 (Wyo. 1995). Those exceptions include:

"1) search of an arrested suspect and the area within his control; 2) a search conducted while in hot pursuit of a fleeing suspect; 3) a search and/or seizure to prevent the imminent destruction of evidence; 4) a search and/or seizure of an automobile upon probable cause; 5) a search which results when an object is inadvertently in the plain view of police officers while they are where they have a right to be; 6) a search and/or seizure conducted pursuant to consent; and 7) a search which results from an entry into a dwelling in order to prevent loss of life or property."

*Morris,* 908 P.2d at 935 (*quoting Ortega v. State,* 669 P.2d 935, 940–41 (Wyo.1983), *overruled on other grounds sub nom. Jones,* 902 P.2d at 692). When a proper objection or motion is made by a defendant, the state bears the burden of proving that one of these exceptions applies. *Mickelson v. State,* 906 P.2d 1020, 1022 (Wyo.1995); *Dickeson,* 843 P.2d at 610.

[¶ 62] The appellant relies primarily on two cases to support his assertion that his attorney was ineffective. In *Dickeson,* the defendant's arson conviction was reversed because she did not receive effective assistance of counsel. Counsel's deficiency was the failure to file a motion to suppress evidence seized without a warrant under circumstances not fitting one of the exceptions to the warrant requirement. *Dickeson,* 843 P.2d at 613. Similarly, in *Morris,* the defendant's controlled substance convictions were reversed because the court did not suppress evidence seized from the defendant's wallet, where there was no warrant and no exception applied. *Morris,* 908 P.2d at 937. In the instant case, the appellant insists that, although he consented to a pat-down search for weapons before getting into the patrol car, the scope of that consensual search was exceeded when the officer searched the appellant's wallet.

[¶ 63] The State counters the appellant's argument by reviewing the concept of "levels of interaction between police and citizens," citing *Collins v. State,* 854 P.2d 688, 691–92 (Wyo.1993). We addressed these interactions in *Brown v. State,* 944 P.2d 1168, 1171 (Wyo.1997):

Because in this case the reason for stopping the car is different from the articulable facts and suspicion which led [the officer] to implement intrusive measures after the stop, we employ three steps of analysis. In order for Brown's arrest to be valid, the initial stop must have been justified at the inception. *Collins v. State,* 854 P.2d at 691 (brief seizures or *Terry* stops, must be supported by reasonable suspicion); *see also United States v. King,* 990 F.2d 1552, 1557 (10th Cir.1993) (To determine whether an investigative detention or protective search is reasonable, the court must decide whether the stop is justified at its inception, and whether the officer's actions are reasonably related to the scope of the circumstances.). Second, articulable facts must have existed to demonstrate that [the officer] had a reasonable suspicion to justify the intrusive measures used to ensure his safety. *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir.1993) (a seizure has to be reasonable at its inception and reasonable as conducted). Third, [the officer] must have had probable cause at the time of Brown's arrest. *See, e.g., Wilson,* 874 P.2d [215] at 220 [ (Wyo. 1994) ].

[¶ 64] In *Brown,* a police officer, suspecting that he was witnessing drunk driving, stopped a vehicle that was being driven erratically. About an hour earlier, the officer had received a report of an armed robbery perpetrated by two black males. As he approached the stopped car, the officer became alarmed because he could not see anyone in it. He then saw two black males slouched down in the front seat so their heads were not visible above the seat. He ceased his approach to the vehicle and called for backup. When other officers arrived, they ordered the two men out of the car at gunpoint. The men were handcuffed and placed in separate police cars. In response to a request for identification, Brown lied. When the truth of his identity was learned, Brown was

arrested for interference with a police officer. While Brown was being booked into jail, police discovered in his clothing money stolen in the armed robbery. *Brown,* 944 P.2d at 1170.

[¶ 65] Brown filed a motion to suppress the evidence that was obtained after he was ordered out of the car at gunpoint. The district court found Brown's arrest lawful and Brown appealed. *Id.* In affirming the district court's decision, we described the analysis that must be followed in reviewing such police-citizen encounters:

> To decide this issue, we must consider whether the facts [the officer] learned during the first few moments of his investigation along with the information in the radio transmission are sufficient to justify the use of the intrusive measures. In this regard the case at bar is notably similar to *Medrano v. State,* 914 P.2d 804 (Wyo. 1996), in that during the police investigation of both cases new facts came to light that created a new suspicion. In *Medrano,* we upheld a conviction for possession with the intent to distribute a controlled substance, even though the initial suspicion articulated for stopping Medrano was that he generally fit the description of a robbery suspect. 914 P.2d at 808. Once the police officer determined Medrano was not the robbery suspect, this court held that the facts and circumstances which came to light during the investigation constituted sufficient grounds for a reasonable suspicion that criminal activity was afoot. 914 P.2d at 808. *See also Collins v. State,* 854 P.2d at 695 (a detention based on reasonable suspicion can, through the development of additional facts during the investigation, evolve into probable cause for arrest).

> Although we have not previously considered whether the use of intrusive measures as invoked in this case transforms an investigatory stop into an arrest, with regard to officer safety we have recently said:

> > "Nothing written here should be cited for the proposition that proper regard for officer safety might run police afoul of an arrestee's constitutional rights. The concerns for officer safety articulat-

> > ed by *Terry [v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ] have only increased exponentially over the years."

> > *Mickelson v. State,* 906 P.2d 1020, 1023 (Wyo.1995).

*Brown,* 944 P.2d at 1171–72.

[¶ 66] A somewhat similar situation occurred in *Wilson v. State,* 874 P.2d 215 (Wyo. 1994), but with a different result. A police officer observed Wilson shortly after midnight walking along a street. Wilson was walking rapidly, but with "lurching" steps. The officer pulled his patrol car up near Wilson and asked if he was okay. Smelling alcohol on Wilson's breath, the officer asked Wilson for identification, which Wilson provided. Pursuant to department policy, the officer then radioed for a routine warrants check, which took less than two minutes. The encounter with Wilson was interrupted when the officer saw smoke coming from a nearby building. The officer went to investigate, telling Wilson to "stay in the area." *Wilson,* 874 P.2d at 217.

[¶ 67] After directing fire trucks to the fire, the officer returned to find Wilson. He helped Wilson cross the street, and then once again asked him to wait while he checked on the fire. As the officer worked traffic control at the fire, he received a radio report that Wilson had two outstanding arrest warrants. The officer went back to Wilson's location, told him about the warrants, and arrested him. In the process, the officer noticed an oily patch on Wilson's shirt. The officer touched the stained area, at which time Wilson said, "What are you doing? I don't smell like smoke." The next day, while in custody on the existing warrants, Wilson made voluntary incriminating statements about the fire. *Wilson,* 874 P.2d at 217–18.

[¶ 68] The district court denied Wilson's motion to suppress the evidence obtained after the officer's initial stop of Wilson. On appeal, this Court reversed, holding that, while the officer's initial contacts with Wilson were legal as part of the officer's "community caretaker" function, the continued detention of Wilson thereafter for the purpose of running a National Crime Information Center (NCIC) records check, in the absence of rea-

sonable suspicion of illegal activity, was an illegal seizure under the Fourth Amendment. *Wilson*, 874 P.2d at 220–26.

[¶ 69] The lesson to be learned from these cases is that resolution of a search and seizure issue in the context of an investigatory stop that becomes an arrest requires application of a totality of the circumstances test. *Martindale v. State*, 2001 WY 52, ¶ 11, 24 P.3d 1138, 1141 (Wyo.2001); *Buckles v. State*, 998 P.2d 927, 930 (Wyo. 2000). The same test must be used in cases such as *Wilson* and *Morris* and the instant case, where the initial contact with the defendant did not arise out of an investigatory stop, but was initiated out of concern for the defendant's welfare. When an officer observes conduct that suggests a person may be injured or otherwise in need of assistance, the officer's community caretaker function allows him to contact that person regardless of the lack of any articulable suspicion of criminal activity. Instead, the contact may be justified by showing the "specific and articulable facts" upon which the officer relied in exercising his community caretaker function; that is, in acting to enhance public safety. *Morris*, 908 P.2d at 936. Facts learned during that initial contact may lead to reasonable suspicion of criminal activity, and that reasonable suspicion may lead to further investigation and an eventual arrest.

[¶ 70] Application of these legal precepts to the facts of the instant case leads to the conclusion that the arresting officer's contacts with the appellant did not constitute an unreasonable search and seizure and, thus, to the further conclusion that the appellant's trial counsel was not ineffective for failing to seek suppression of the evidence resulting from those contacts. A review of the chronology of this particular police/citizen encounter supports those conclusions.

[¶ 71] The officer who eventually arrested the appellant was working the night shift in Evansville, which is adjacent to Casper. During his shift, he had received a radio report of a murder in Casper, with a request to be on the lookout for the person suspected of being involved. Prior to going off duty at 7:00 a.m., the officer "decided to make one last pass through Evansville, make sure no-body was broke down, nobody was stranded on the roadway." As the officer drove down Lathrop Road, he noticed someone walking down the road. Having in mind the radio report of the murder in Casper, the officer pulled up next to the person, who was later identified as the appellant. The officer rolled down his window and asked the appellant whether he was okay and whether everything was all right. The appellant ignored the officer and made no response. The officer then drove past the appellant and turned around. Once again, he asked the appellant if everything was okay. This time, the appellant said, "yes." The officer observed that the appellant's clothing was soaked "from head to toe," and that the appellant's skin looked very pale. The appellant acted as if he was cold. His hands were in his pockets and he looked "shriveled up" as he walked. At the appellant's request, the officer directed him towards the interstate highway.

[¶ 72] As the appellant continued walking, the officer contacted dispatch and gave a physical description of the appellant. The dispatcher forwarded this information to the Casper Police Department, and then relayed to the officer that this description did not appear to match their suspect. The officer then noticed in his rear view mirror that the appellant had run across the road and was walking along another road toward the interstate. The officer decided to contact the appellant a third time. He testified that his suspicions had been raised because (1) the appellant had at first ignored him; (2) the appellant's clothing was soaked and his skin was pale, as if he had been walking all night; (3) it was very early in the morning; (4) the appellant was on a dirt road in a relatively rural area; and (5) the appellant ran across the road after their contact.

[¶ 73] The officer again stopped his vehicle, this time waiting for the appellant to approach. He saw the appellant make a movement with his left hand, as if throwing something or gesturing the officer away. The officer got out of his car and walked over to the appellant. As they stood there face-to-face, the appellant's coat was open, allowing the officer to see what appeared to be blood on the appellant's shirt. The officer

asked the appellant if he was cut and if he needed medical attention, to which the appellant responded, "no."

[¶ 74] The officer asked questions of the appellant for three or four minutes, all directed to the appellant's safety and welfare. When the appellant said that he was cold, the officer told him he could warm up in the patrol car, but department policy required that he would first have to be "patted down" for weapons. The appellant did not verbally consent to be searched for weapons, but he manifested his consent by placing his hands on the patrol car to accommodate the search. The officer found two knives on the appellant, one in each of the appellant's coat pockets.

[¶ 75] During the weapons search, the officer located the appellant's wallet, which he placed on the hood of the patrol car. Having removed the appellant's weapons, the officer looked in the wallet to attempt to determine the appellant's identity. He found a driver's license bearing the name James Norman Lancaster, which he recognized as the name of the Casper Police Department's homicide suspect.[16] At this point, despite the realization that he was, indeed, dealing with a murder suspect, the officer determined that he would not "lose my cool," but would "[maintain] a professional posture." He continued his conversation with the appellant about the cold weather and the appellant being soaked, once again inviting the appellant to warm up in the back seat of the patrol car. He told the appellant that he was not under arrest, but that department policy required anyone sitting in the back seat of the patrol car to be handcuffed. He then handcuffed the appellant "to the front" and placed him in the vehicle.[17] The officer contacted the Casper police to inform them that he had their suspect in custody. The officer did not question the appellant after he was handcuffed and placed in the patrol car. While the two men sat waiting for the Casper police, however, the appellant volunteered the statement that he had been drinking with some friends and that he had had a rough night.

[¶ 76] Sometimes, it is helpful to analyze the reasonableness of police conduct by considering what it is society expects its police officers to do given certain circumstances. Here, an officer on routine patrol early in the morning after a cold, wet night, sees someone walking along a dirt road. The officer is aware of a murder the night before in neighboring Casper and he has been told to be on the lookout for the murder suspect, who is still at large. While he did not testify so directly, it is clear from the officer's testimony that it is unusual to find someone walking along the road at that place and time. Surely, the officer should not be expected to ignore the man and drive away. The officer's initial contact with the appellant was not unreasonable.

[¶ 77] As the officer talked with the appellant, the appellant's appearance and conduct, detailed above, justified the further brief detention that resulted from the officer's continued questioning about the appellant's health and welfare. It is telling that, even when informed via dispatch that this man was likely not the homicide suspect, the officer continued to try to ascertain the appellant's condition and destination. Only upon discovery of what appeared to be blood on the appellant's shirt and discovery of the two knives did the encounter shift from a community caretaker function to an investigatory stop and then to an arrest. It was reasonable and appropriate as those events occurred for the officer to determine the appellant's true identity. Viewing the totality of the circumstances of this case, we conclude that the contact was justified at its inception, that articulable facts have been shown to justify the intrusive measures taken by the officer during the encounter, and that probable cause existed at the time the appellant was arrested.

[¶ 78] Perhaps a final word or two should be said about the officer's use of a certain amount of guile in accomplishing the appellant's arrest. It is true that, upon encounter-

16. Earlier, the appellant had told the officer that his name was "Norman."

17. Arrestees are generally handcuffed with their hands behind their back, an uncomfortable position. The officer handcuffed the appellant's hands in front of him.

ing the appellant, the officer did not immediately ask him whether he was the murderer the Casper police were looking for. Neither did the officer, upon determining the appellant's identity, immediately state that he was under arrest for that crime. In a perfect world, we might want our police officers to act that way. But, in a perfect world, there would be no murders and we would not need police officers. Our constitutional protection against unreasonable searches and seizures must be interpreted in light of the real world's limitations and dangers. More often than not, complaints about police/citizen encounters describe law enforcement officers who are too quick to resort to force. In the case now before this Court, a police officer on routine patrol in a remote area, alone with a murder suspect, accomplished an arrest with minimal intrusion and with *no* use of force.

 [¶ 79] The above conclusions mean that the first element of the *Strickland* test has not been met in that trial counsel's performance was not deficient. While this determination makes it unnecessary to address the second element—prejudice to the appellant—we will make a few brief comments in that regard. In his appellate brief, the appellant's prejudice argument focuses on two pieces of evidence: the identification card found in the appellant's wallet and appellant's statement in the patrol car about drinking with friends and having a rough night. However, even had this evidence been illegally obtained, no substantial prejudice to the appellant resulted from its introduction. It is true that the New Mexico identification found in the appellant's wallet was used when the appellant purchased the rifle which allegedly was used in shooting Penn and Hanson, and that this became direct evidence that the appellant owned the rifle. It is also true that when officers searched the area of the Star Apartments after the murder, they found the rifle hidden in high weeds together with a suitcase containing the appellant's identification. Further, the crime occurred in the appellant's apartment and the appellant was seen just outside the apartment holding the rifle. In short, there was considerable evidence besides the New Mexico identification card connecting the appellant to the rifle. Absence of

the New Mexico identification would not have changed the outcome of the trial.

[¶ 80] The same can be said of receipt into evidence of the appellant's statement in the patrol car. The statement—that he had been drinking with friends and had had a rough night—was not needed to identify the appellant as the person who had been involved in the incident. There was overwhelming evidence of that fact. Beyond that, the statement is not really even inculpatory; drinking and having a rough night is as consistent with the appellant's version of the incident as it is with Hanson's version. If any prejudice to the appellant resulted from admission of his statement, such prejudice was neither unfair nor undue.

## CONCLUSION

[¶ 81] The trial court committed error in admitting into evidence a videotaped re-enactment of the appellant's attack upon Penn and Hanson, but such error was harmless. There is no reasonable possibility that the verdict would have been more favorable to the appellant absent introduction of the videotape. The videotape was merely cumulative of the voluminous admissible evidence pointing to the appellant's guilt.

[¶ 82] Under the circumstances of this case, the prosecutor's questions to a police officer about the appellant having "ignored" the officer and having "not responded" to the officer were not improper comments upon the appellant's exercise of his right to silence and were not, therefore, prosecutorial misconduct. Rather, the officer's testimony merely described his contact with the appellant and the appellant's conduct and demeanor during that contact.

[¶ 83] The prosecutor questioned Hanson and his doctor about the long-term effects of scarring from Hanson's wounds, and he also asked Hanson about the emotional effects of the attack. The extent of the scarring is related to the extent of the wounds and is, therefore, relevant to the issue of an attempt to kill. Testimony about the emotional impact on Hanson was not relevant. Introduction of this evidence was not prosecutorial misconduct, however, because there is no

reasonable possibility that the verdict would have been different absent the evidence.

[¶ 84] The prosecutor asked Hanson two rather innocuous questions as to whether Hanson believed the appellant's "stories" about being in the armed forces and making one of the knives he was showing Hanson and Penn. It was improper for the prosecutor to ask these questions, because the information was irrelevant and because the questions tended to seek an opinion as to the appellant's veracity. Nevertheless, the error was harmless, given that there is no reasonable possibility that these two brief answers resulted in a verdict that would have otherwise been more favorable to the appellant.

[¶ 85] Trial counsel's failure or decision not to move to suppress the evidence obtained after the appellant was placed in the patrol car cannot be categorized as ineffective assistance of counsel. Under the totality of the circumstances, the officer's conduct was reasonable throughout his encounter with the appellant, and such a motion would not have been granted.

[¶ 86] Affirmed.

LEHMAN, Chief Justice, dissenting.

[¶ 87] I respectfully dissent. I agree with the majority that the introduction of the Hanson videotape into evidence was error. I do not agree, however, that a "massive amount of evidence" exists to support the majority's conclusion that the error was harmless.

[¶ 88] The facts set forth in the majority opinion discuss the contrasting stories of the appellant and the only witness, Hanson. The "massive amount of evidence" referred to by the majority is simply the physical evidence at the scene of the crime. No one other than Hanson and the appellant testified as having actually observed the events that transpired on the evening in question. Therefore, it was the videotape, which the judge instructed the jury was for the "limited purposes of evaluating the credibility of the declarant, Mr. Hanson," that provided the jury a court-approved vehicle to examine for a second time Hanson's versions of the events. This bolstering of Hanson's credibility certainly

cannot be dismissed as harmless error in a trial that amounted to a "swearing match" between Hanson and the appellant.