2004 WY 39

**Ivan P. ARMSTRONG, an individual; and Jennifer Armstrong, an individual, Appellants (Plaintiffs),**

v.

**Tanya L. HRABAL, M.D., an individual; and Emergency Medical Physicians, P.C., a Wyoming professional corporation, Appellees (Defendants).**

No. 03–36.

Supreme Court of Wyoming.

April 12, 2004.

Rehearing Denied May 11, 2004.

Representing Appellants: Robert G. Pickering of the Pickering Law Firm, P.C., Fort Collins, Colorado; and Henry F. Bailey, Jr. of Bailey, Stock & Harmon, P.C., Cheyenne, Wyoming.

Representing Appellees: J. Kent Rutledge and James C. Kaste of Lathrop & Rutledge, P.C., Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1]   This is a medical malpractice case in which the appellants dispute several evidentiary rulings of the district court, its denial of their motion for leave to amend their complaint, and its denial of their motion for a new trial.  We affirm in part, reverse in part, and remand to the district court.

## ISSUES

1.   Did the district court err in precluding the appellants' retained emergency medicine expert from offering opinions as to the standard of care for treatment?

2.   Did the district court err in precluding the appellants' only other retained expert from offering opinions as to the standard of care?

3.   Did the district court err in precluding the appellants' retained expert from offering opinions as to the standard of care for an infectious disease consultant?

4.   Did the district court err in precluding evidence of appellee Hrabal's prior malpractice claims, the suspension of appellee Hrabal's hospital privileges, and other matters affecting her credibility?

5.   Did the district court err in denying the appellants' motion for leave to file an amended complaint to allege negligent misrepresentation?

## FACTS

[¶ 2] The appellants in this case are husband and wife, Ivan and Jennifer Armstrong. On February 5, 1999, one of their children was diagnosed at a private medical clinic as suffering from influenza. As a precautionary measure, the Armstrong family members were prescribed an anti-influenza medication. Despite taking a full ten-day course of the medication, Ivan Armstrong (Armstrong) awoke on February 25, 1999, with head and body aches and nausea. He returned to the medical clinic and was prescribed a second dose of the same anti-influenza medication.

[¶ 3] On February 28, 1999, Armstrong went to the emergency room of the United Medical Center (UMC) in Cheyenne, complaining of worsening symptoms. A nurse noted he had both an elevated temperature and an elevated heart rate. Armstrong was seen by appellee, Tanya L. Hrabal, M.D., an employee of appellee, Emergency Medical Physicians, P.C. (EMP). Dr. Hrabal obtained Armstrong's medical history and did a physical examination. After considering numerous potential causes of Armstrong's symptoms, including trauma, appendicitis, gallbladder disease, and viral or bacterial infection, Dr. Hrabal concluded that the most likely cause was influenza.

[¶ 4] Dr. Hrabal ordered the administration of fluids and medication to reduce Armstrong's dehydration and high temperature. When Armstrong appeared to improve, Dr. Hrabal discharged him from the emergency room with instructions to return if he did not continue to improve, to take large quantities of clear fluids, to take specified medications, and to follow up with his family doctor, Ronald Malm, M.D.

[¶ 5] On March 2, 1999, Armstrong went to see Dr. Malm because he was experiencing dizziness, fever, vomiting and diarrhea. Dr. Malm had originally prescribed the anti-influenza medication for the Armstrong family. Dr. Malm diagnosed Armstrong as suffering from gastroenteritis, or stomach flu, and dehydration, and admitted him to the hospital for observation and rehydration. Laboratory test results and x-rays were sufficiently normal so as not to change Dr. Malm's diagnosis.

[¶ 6] During the afternoon of March 3, 1999, Armstrong's condition dramatically worsened. His attending nurses contacted Dr. Malm's on-call partner, Dr. Schiel. After examining Armstrong and seeing the abnormal results of new laboratory tests, Dr. Schiel suspected that Armstrong might be suffering from a bacterial infection, or sepsis. Dr. Schiel ordered blood cultures and requested a consultation from Philip Sharp, M.D., an infectious disease specialist.

[¶ 7] Dr. Sharp saw Armstrong on the night of March 3, 1999, and concluded that Armstrong was suffering from sepsis, possibly due to an intestinal infection. Dr. Sharp ordered broad coverage antibiotics and body fluid cultures for Armstrong. The next day, Dr. Sharp noted that the cultures were positive for bacterial infection. He also felt that a heart murmur might be present. Subsequent tests revealed that Armstrong had endocarditis, which is an infection of the heart valve. He underwent surgery to replace his damaged aortic valve with a prosthetic valve. The endorcarditis was caused by bacteria called *staphylococcus aureus*.

## NATURE OF THE CASE

[¶ 8] On February 22, 2001, the appellants filed a medical malpractice action against the appellees.[1] After engaging in discovery, the appellants sought leave to file an amended complaint to add an allegation of negligent misrepresentation based upon Dr. Hrabal's alleged failure to disclose to EMP her involvement in a previous lawsuit in which failure to diagnose a progressive bacterial infection had been alleged. The appellees resisted the motion to amend and moved *in limine* to preclude admission of evidence of any prior malpractice claims against Dr. Hrabal. The motion to amend was denied and the motion *in limine* was granted. Those rulings are the basis for the fourth and fifth issues in this appeal.

1. Appellee EMP has conceded that appellee Hrabal was its employee and that she was acting within the course and scope of that employment during all relevant times.

[¶ 9]  In their pretrial disclosure of expert witnesses, the appellants named two retained medical experts: Steven M. Tredal, M.D., board certified in emergency medicine, and Gary M. Green, M.D., board certified in internal medicine and infectious disease.  It was intended that Dr. Tredal would establish the standard of care for emergency room physicians and that Dr. Green would do the same for emergency room physicians and for infectious disease practice in the emergency room setting.  At trial, the district court sustained objections to questions posed by appellants' counsel to Dr. Tredal and Dr. Green concerning the standard of care. Those rulings are the basis for the first three issues in this appeal.

## STANDARD OF REVIEW

### Evidentiary Rulings

[¶ 10]  Trial court rulings on the admissibility of evidence are reviewed for an abuse of discretion.  *Clark v. Gale*, 966 P.2d 431, 435 (Wyo.1998).  We apply the following standard:

> "Such decisions are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. . . .  Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary or capricious manner. . . .
>
> A trial court's evidentiary rulings ' "are entitled to considerable deference," ' and will not be reversed on appeal so long as ' "there exists a legitimate basis for the trial court's ruling. . . ." ' "

*Dysthe v. State*, 2003 WY 20, ¶ 16, 63 P.3d 875, 883 (Wyo.2003) (*quoting Lancaster v. State*, 2002 WY 45, ¶ 11, 43 P.3d 80, 87 (Wyo.2002)).  This standard applies to a trial court's exclusion of expert testimony.  *Chapman v. State*, 2001 WY 25, ¶ 8, 18 P.3d 1164, 1169 (Wyo.2001); *Bunting v. Jamieson*, 984 P.2d 467, 470 (Wyo.1999).  Expert testimony is admissible if it meets the requirements of W.R.E. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact

to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[¶ 11] All relevant evidence is admissible. W.R.E. 402.  Even where relevant, however, evidence may be excluded if it constitutes the "needless presentation of cumulative evidence."  W.R.E. 403.  Furthermore, rulings excluding evidence are subject to harmless error analysis and there must be an offer of proof under W.R.E. 103:

> (a) *Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> . . .
>
> (2) Offer of Proof.—In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

### Motion for Leave to Amend Complaint

The law in Wyoming is well settled that the decision to allow amendment to pleadings is vested within the sound discretion of the district court.  That decision will be reversed only for an abuse of discretion shown by clear evidence.

*Ekberg v. Sharp*, 2003 WY 123, ¶ 9, 76 P.3d 1250, 1253 (Wyo.2003).  Leave to amend pleadings "shall be freely given when justice so requires."  W.R.C.P. 15(a).  We have identified the "proper test as to what the trial court should consider when an amendment is proffered" to be the following:

> " * * * If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.  In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the

leave sought should, as the rules require, be 'freely given.' * * * "

*Beaudoin v. Taylor,* 492 P.2d 966, 970 (Wyo. 1972) (*quoting Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)).

## DISCUSSION

### Did the district court err in precluding the appellants' retained emergency medicine expert from offering opinions as to the standard of care for treatment?

[¶ 12] As part of his burden of proof in a medical malpractice action, the plaintiff must establish the accepted standard of medical care or practice. Wyo. Stat. Ann. § 1–12–601 (LexisNexis 2003); *Oakden v. Roland,* 988 P.2d 1057, 1059 (Wyo.1999) (*quoting Harris v. Grizzle,* 625 P.2d 747, 751 (Wyo.1981)). As with allegations of negligence in other professions, the standard of care in a medical malpractice case generally must be proven through expert testimony. *Smyth v. Kaufman,* 2003 WY 52, ¶ 27, 67 P.3d 1161, 1169 (Wyo.2003); *Sayer v. Williams,* 962 P.2d 165, 167–68 (Wyo.1998) (*quoting Mize v. North Big Horn Hosp. Dist.,* 931 P.2d 229, 233 (Wyo.1997)); *Siebert v. Fowler,* 637 P.2d 255, 257 (Wyo.1981). *See also Rino v. Mead,* 2002 WY 144, ¶ 17, 55 P.3d 13, 19 (Wyo.2002).

[¶ 13] The appellants called Dr. Tredal, an emergency medicine specialist, to testify as to the standard of care Dr. Hrabal was expected to meet when Armstrong appeared at the UMC emergency room. During the direct examination of Dr. Tredal, the following exchange occurred:

> Q. And, Doctor, did Tanya Hrabal meet the core standard of care in treating Ivan Armstrong on the 28th of February?
>
> A. No.
>
> Q. What should she have done?
>
> MR. RUTLEDGE: Your Honor, this has been asked and answered about five times.
>
> THE COURT: Sustained.

2. No issue is presented in this appeal as to how this question was answered.

3. *See also* W.R.E. 611(a), where the trial court is instructed to "exercise reasonable control over

[¶ 14] The appellants' trial counsel made no immediate response when the objection was sustained and made no offer of proof. In their appellate brief, the appellants contend that their counsel intended to question Dr. Tredal about the standard of care in several distinct areas—evaluation, testing, consultation, treatment, appropriateness of discharge, and aftercare instructions—and that only evaluation, testing and consultation had been covered when the objection was sustained. They argue that it was clear error for the district court to preclude them from eliciting testimony on the critical issue of treatment. They identify prejudice in the fact that the jury submitted the following note to the district court during deliberations:

> We have a problem with "what is standard of care"[.] All dr's testified differently We are [to] decide on evidence presented—If we come to an agreement—can we present a statement to the attys/plaintiff how we came to—? ? [2]

Furthermore, in finding against the appellants, the jury concluded that Dr. Hrabal did not deviate from the standard of care expected of her as an emergency room physician.

[¶ 15] The appellees' counter-argument is that, pursuant to W.R.E. 403, the district court properly exercised its discretion in sustaining their objection in order to prevent the "needless presentation of cumulative evidence." [3] They point to numerous prior questions where Dr. Tredal had been asked about the standard of care or about what Dr. Hrabal "should have done:"

> Q. And how do you treat bacterial sepsis generally?
>
> . . .
>
> Q. . . . Could you tell us what things Dr. Hrabal failed to do to meet the standard of care?
>
> . . .
>
> Q. And what were—what would the standard of care have required for [bacter-

the mode and order of interrogating witnesses . . . so as to . . . avoid needless consumption of time. . . ."

ial sepsis] on the differential to be ruled out?

. . .

Q. What testing was required by the standard of care?

. . .

Q. Were all of these tests required to evaluate by the standard of care, were they required to evaluate Ivan Armstrong on February 28, 1999?

. . .

Q. Now, Doctor, in your opinion in this case did the standard of care require objective tests to rule out sepsis?

. . .

Q. If a doctor is thinking bacterial infection does the standard of care require them to do a septic work-up?

[¶ 16] In the context of all these questions and their answers, sustaining the objection was certainly understandable. The appellants' counsel did not explain to the district court his plan to pursue the standard of care in six sub-categories nor did he make an offer of proof to alert the district court to how the proposed testimony would differ from earlier testimony. Further, the record does not suggest that such a plan of attack was apparent from the previous questions. In this situation, an offer of proof was required by W.R.E. 103(a)(2). *See Contreras By and Through Contreras v. Carbon County School Dist. No. 1,* 843 P.2d 589, 595–96 (Wyo.1992); *Rudolph v. State,* 829 P.2d 269, 274–75 (Wyo.1992); and *Pack v. State,* 571 P.2d 241, 245 (Wyo.1977). The dual purpose of an offer of proof is to alert the trial court to the nature of the error in order to allow corrective action, and at the same time to create a sufficient record for appellate review. *Padilla v. State,* 601 P.2d 189, 194 (Wyo.1979). Those purposes were not served in this case, and we affirm the district court's decision to sustain the appellees' objection.

***Did the district court err in precluding the appellants' only other retained expert from offering opinions as to the standard of care?***

[¶ 17] Gary M. Green, M.D., was retained by the appellants as an expert to establish the standard of care for infectious disease practice in the emergency room setting. After graduation from Georgetown University School of Medicine, Dr. Green did an internship in internal medicine at the Medical Center of Delaware. He then finished his residency at St. Joseph's Hospital & Medical Center in Phoenix, Arizona. Next, he completed a fellowship in infectious disease at U.C.L.A. He is board-certified by both the American Board of Internal Medicine and the American Board of Infectious Diseases. At the time of trial, he was Sub-Chief of the Division of Infectious Diseases at Santa Rosa Kaiser Permanente Medical Center.

[¶ 18] Dr. Green's medical residency included training in emergency medicine. During his infectious disease fellowship at U.C.L.A., Dr. Green also worked as an emergency room physician at West Los Angeles Kaiser Hospital. After working for a time at Cedars Sinai Medical Center, also in Los Angeles, Dr. Green was recruited to Casper, where he established a private practice and worked at the Wyoming Medical Center.

[¶ 19] In Casper, Dr. Green consulted in the emergency room at Wyoming Medical Center "almost daily." He also taught infectious disease recognition and treatment to family practice residents at the University of Wyoming Family Practice Residency Program. Dr. Green testified as follows in reference to his familiarity while in Casper with emergency room treatment of infectious diseases:

Q. While you were in Casper did you become familiar with the standards of practice for a reasonable and prudent board certified emergency physician in connection with recognition of infectious diseases?

A. Yes, I was. In fact, it is not much different from that for internal medicine and family practice.

Q. Is it substantially similar?

A. Yes.

[¶ 20] Dr. Green moved from Casper to Eureka, California, in 1999. There, he was the sole infectious disease specialist in two

counties, and he held privileges at three area hospitals. He attended regularly in the emergency departments of all three hospitals. In doing so, he became familiar with the standards of care applied to infectious disease patients in those emergency departments, which standards were the same as had been applied in Casper. In his current position at Santa Rosa Kaiser Permanente Medical Center, he teaches emergency medicine specialists how to evaluate and treat patients with sepsis:

Q. Dr. Green, do you teach emergency medicine, board-certified emergency medicine physicians about sepsis?

A. Yes, I do.

Q. When was the last time you did that?

A. The last lecture I gave to the ER department was within the last six months.

A. And did you teach emergency medicine physicians about infectious disease at Wyoming Medical Center?

Q. Yes, I did.

A. Do you teach them what standards to apply in approaching—in evaluating, diagnosing, and treating patients presenting with fever, tachycardia, of potential infectious processes?

A. Yes, that's a basic tenant [sic] for the lectures I give.

Q. Is that part of your job duties as infectious disease chief at Santa Rosa Hospital?

A. It is.

Q. And have you done that—did you do that at Wyoming?

A. I did.

[¶ 21] After establishing Dr. Green's qualifications, the appellants' counsel began to inquire directly about the standard of care:

Q. Are the opinions that you're giving today within a reasonable degree of medical probability?

A. Yes, they are.

Q. And is [sic] the standard of care opinions you're rendering today, are those based upon the standard of care for emergency medicine when the questions are in that area of focus?

A. Yes, they are.

Q. And when questions will be in the focus of infectious disease will the standard of care then be for that subspecialty?

A. Yes, they will be.

[¶ 22] Counsel then began to ask Dr. Green about the process known as "differential diagnosis." At that point, the appellees' counsel interjected the following objection:

MR. RUTLEDGE: Your Honor, I'm going to object to relevance and also as to qualifications. If this is intended to be standard of care testimony about the standards applicable to an emergency physician, Dr. Green does not qualify to give standard of care opinions about emergency medicine physicians. He's not in the same line of practice.

[¶ 23] The district court's initial reaction was to overrule this objection on the ground that "he does present some evidence that he has some experience in emergency rooms." The appellees' counsel was granted leave to *voir dire* the witness, however, during which the following exchange occurred:

Q. But your only experience practicing as an emergency room physician was for about one year during your infectious diseases fellowship between '95 and '96; isn't that true?

A. That's correct, sir.

. . .

Q. And your training is considerably different than for a family practice physician practicing in the emergency department, isn't it?

A. My training is different from a family practice physician, that's correct.

Q. And your training is considerably different from a board certified person who has gone through an emergency medicine residency program?

A. Yes, my training is different from an ER trained physician.

Q. You've never gone through the emergency medicine residency program?

A. That's correct.

. . .

Q. You've gone through an internal medicine residency?

A. That's correct.

Q. And that's not required to practice emergency medicine, is it?

A. No, it is not.

. . .

Q. You agree that ethically you should have recent and substantive experience in the field or line of practice about which you're testifying?

A. That's correct, I do agree with that.

Q. And your recent and substantive experience as an emergency physician is consulting only with emergency physicians as an infectious diseases specialist; isn't that true?

A. That's correct.

Q. Okay. And when you're working in the emergency department and since you've completed your fellowship, all the time you've spent working in the emergency department has been as an infectious diseases specialist, hasn't it?

A. At Kaiser Santa Rosa, sir?

Q. No, anywhere.

A. Is that what you are asking?

Q. Anywhere.

A. There are times when I've done internal medicine call, but it is fairly minor, I would say less than 5 percent of my time.

Q. But you haven't worked as an emergency physician in the emergency department since?

A. Since West Los Angeles Kaiser, that's correct.

THE COURT: What year was that '95?

THE WITNESS: About '95, '96, Your Honor.

Q. (BY MR. RUTLEDGE) And when you're consulted by emergency department physicians in the emergency department you're consulted not as an emergency physician but as an infectious diseases specialist, aren't you?

A. That's correct.

MR. RUTLEDGE: Your Honor, I renew my objection to Dr. Green testifying about the standard of care. He is not in the same line of practice.

[¶ 24] At the conclusion of the *voir dire* examination, the district court held a sidebar conference in order to rule on the objection:

THE COURT: Kent, I need to ask you a question. I think you quoted from the ethics standards. What do those standards say one more time? I think that—

MR. RUTLEDGE: They say that you should have recent and substantive experience in the same line of practice.

THE COURT: Experience. So the question is, does teaching from a perspective of infectious disease specialist count for emergency room experience? Mr. Pickering.

MR. PICKERING: Well, Your Honor, the test is not that. The test is the statutory test found in the Wyoming statutes which requires only that a physician be substantially familiar with the standards of care of the area of practice, and he is. We're bound by the statutory requirements of the state legislature.

THE COURT: I would imagine that the ethics of the medical profession have something to do with this decision, wouldn't you agree?

MR. PICKERING: It may have.

THE COURT: Which he would violate if I'm going to let someone violate his ethics from the stand.

MR. PICKERING: He's not violating his ethics.

THE COURT: Sure he is. He has an opinion that doesn't violate the ethical—

MR. PICKERING: He's called to the emergency room three days a week not as an emergency room doctor. They said he's observed the same standard of care.

THE COURT: Is this witness going to give opinions on causations [*sic*]? Is he?

MR. PICKERING: Causation, yes.

THE COURT: I'm going to sustain the objection on standard of care.

[¶ 25] In discussing the first issue in this opinion, we noted that the plaintiff in a medical malpractice action must establish the applicable standard of care, generally through expert testimony. We also noted that, under W.R.E. 702, a witness may be "qualified as an expert by knowledge, skill, experience,

training, or education...." In addition to these general directives, Wyo. Stat. Ann. § 1–12–601 provides a specific burden of proof in medical malpractice cases:

(a) In an action for injury alleging negligence by a health care provider the plaintiff shall have the burden of proving:

(i) If the defendant is certified by a national certificating board or association, that the defendant failed to act in accordance with the standard of care adhered to by that national board or association; or

(ii) If the defendant is not so certified, that the defendant failed to act in accordance with the standard of care adhered to by health care providers in good standing performing similar health care services.

(b) In either paragraph (a)(i) or (ii) of this section, variations in theory of medical practice or localized circumstances regarding availability of equipment, facilities or supplies may be shown to contravene proof offered on the applicable standard of care.

[¶ 26] The appellants find error in the district court's ruling on several grounds. First, they contend that Dr. Hrabal was not a board-certified specialist in emergency medicine, so they were not required to establish the standard of care adhered to by that national board. Second, they argue that Dr. Green, although also not a board-certified specialist in emergency medicine, established through his testimony that he was well-qualified to testify as to "the standard of care adhered to by health care providers in good standing performing similar health care services," namely the diagnosis and treatment of bacterial infection in the emergency room setting. The appellants rely on *Beavis ex rel. Beavis v. Campbell County Memorial Hosp.*, 2001 WY 32, ¶ 13, 20 P.3d 508, 513 (Wyo.2001), where this Court recognized that the standard of care may be the same in certain instances across lines of practice. They also point out that not only did both Dr. Tredal and Dr. Green testify that the standard of care in recognizing infectious disease in the emergency room did not differ from one area of practice to another, but the appellees' own expert, Dr. Rosen, testified that

there was no reason for Dr. Hrabal to consult with an infectious disease specialist "because the infectious disease specialist has no more information than you do."

[¶ 27] The appellants' third argument against the district court's ruling that Dr. Green could not testify about the standard of care is that the district court allowed the appellees' expert, Dennis L. Stevens, M.D., to give such testimony even though he had no real knowledge of the standard of care that should be applied in the attendant circumstances. The appellees designated Dr. Stevens as an expert to testify about the standard of care and to give opinions as to Dr. Hrabal's care and treatment of Armstrong. Like Dr. Green, Dr. Stevens is board-certified in internal medicine and in infectious disease. Dr. Stevens' attended medical school and did his internship and residency at the University of Utah. He then completed two years of infectious disease training at Brooke Army Medical Center in San Antonio, Texas. He remained at that facility for some time as assistant chief of infectious disease. In 1979, he went to work at the Veteran's Affairs Medical Center, in Boise, Idaho. At the time of trial, Dr. Stevens was Chief of the Infectious Disease Service at the V.A. Center. His current practice involves the diagnosis and treatment of patients with a variety of infectious diseases, and he lectures on infectious disease to University of Washington medical students. Over the years, Dr. Stevens has authored numerous publications dealing with infectious disease.

[¶ 28] Prior to trial, the appellants filed a motion *in limine* seeking to preclude Dr. Stevens from testifying about the standard of care. Citing to Dr. Stevens' deposition, they pointed out that the doctor has had no training in emergency medicine since his internship, that he has never practiced in a private hospital, and that he had not seen and was not familiar with any emergency medicine texts. In short, relying on W.R.E. 702 and Wyo. Stat. Ann. § 1–12–601, just as the appellees later would do in challenging Dr. Green, the appellants argued in their motion that there is no evidence that Dr. Stevens

has any familiarity with the standard of care owed by emergency room specialists.

[¶ 29]   The motion *in limine* was argued during a pretrial conference.  Ironically, the positions taken by the parties in regard to the motion were, for all intents and purposes, exactly the opposite of the positions they later took at trial in regard to Dr. Green.  The appellants raised the following points in seeking to keep Dr. Stevens from establishing the standard of care:  (1) he has had no training in emergency medicine;  (2) he is not board-certified in emergency medicine;  (3) he has no experience in emergency medicine; and (4) he has no familiarity with the emergency medicine standard of care, as required by Wyo. Stat. Ann. § 1–12–601.

[¶ 30]   In response, the appellees raised the following points:  (1) Dr. Hrabal is not board-certified in emergency medicine, so Wyo. Stat. Ann. § 1–12–601 does not hold her to the standard of care for such a specialist;  (2) Dr. Stevens is a preeminent expert in the field of infectious disease;  (3) the question of causation, about which he can testify, is inextricably interwoven with the standard of care;  and (4) he works in the emergency department about once a week dealing with internal medicine emergencies.

[¶ 31]   The reader will remember that the district court's initial reaction during the trial was to overrule the appellees' objection and to allow Dr. Green to testify because "he does present some evidence that he has some experience in emergency rooms."  This initial ruling is reflective of the district court's apparent perception at that time that, by combination of training and experience, Dr. Green was qualified under W.R.E. 702 to testify about the emergency medicine standard of care, and that Wyo. Stat. Ann. § 1–12–601 did not require testimony from a board-certified emergency medicine physician under the circumstances.  The district court's pretrial analysis of the same issue as it involved Dr. Stevens is consonant with that same perception:

THE COURT:   What does he say? What does Dr. Stevens say?

MR. PICKERING:   He's going to say that Dr. Hrabal met the standard of care for an emergency physician.  Dr. Stevens

has never even held privileges at a private hospital.  He's been either at the Army or the VA for 20, 30 years.

THE COURT:   He [d]oesn't have any familiarity with infectious—

MR.  PICKERING:   With emergency medicine.

THE COURT:   Now, why does that matter in this case?

MR.  PICKERING:   Well, Your Honor, because he's going to testify about standard of care.  And the Wyoming statutes require[ ] that they—since she's board certified, or at least holding herself to that standard, that he have familiarity with the standards of care.

THE COURT:   What statute is that?

MR.  PICKERING:   That's Wyoming 1–12–601.

THE  COURT:   Is  it  constitutional? Isn't that a question of evidence for the Court?   Is the legislature intruding into prerogatives—

MR.  PICKERING:   It has been held constitutional in other states, been applied by the Supreme Court of Wyoming numerous times.  He didn't even know the names of emergency text authors.  He's never even looked at an emergency medicine textbook.  He—so we don't think he can offer any opinions on standard of care.  At his deposition I said, are you going to talk about—

THE COURT:   So a guy comes in with a broken leg in the emergency room, the doctor fails to diagnose it.

MR. PICKERING:   Right.

THE COURT:   Your position is that the orthopedic surgeon who knows something about broken legs but has no ER experience cannot tell us what ought to be done in the face of the broken leg?

MR. PICKERING:   I think that's probably true.

THE  COURT:   I don't believe it.   I can't believe that the law is so irrational.

MR. PICKERING:   Well, several cases sided along that way.

THE COURT:   The question is, why do you need a medical expert testimony in the

first place? Case law says you need it because the jury can't speculate. They're not doctors. They need to be told what the standard of care is. So when faced with a condition of is it viral or is it bacterial, what is the relevance of the distinction between an ER doctor and an infectious disease doctor? I don't understand the difference.

MR. PICKERING: Well, Your Honor, the other argument—

THE COURT: You're trying to hold this ER doctor arguably up to standards involving infectious disease diagnoses.

MR. PICKERING: No. We're trying to hold her to the standards of an emergency medicine specialist.

THE COURT: I assume that's lower than an infectious disease specialist.

MR. PICKERING: I would assume so, too.

THE COURT: So someone who says that even though I know about the higher standard, she didn't even violate the higher standard.

MR. PICKERING: That may be, but he doesn't even know what the standard of emergency medicine is. He doesn't do it.

[¶ 32] After this exchange with the appellants' counsel, and after the appellees' counsel responded, the district court denied the appellants' motion to preclude Dr. Stevens' standard of care testimony. Interestingly enough, the district court's decision was announced directly upon the heels of the following statement from the appellees' counsel:

I point out that Dr. Green, their infectious diseases expert, who hasn't practiced in the emergency room for years as an emergency room physician and has only very limited experience practicing in the emergency room, is going to offer standard of care opinions about Dr. Hrabal.

[¶ 33] We are unable to discern from the record, for purposes of W.R.E. 702 and Wyo. Stat. Ann. § 1–12–601, any meaningful distinction between the qualifications of Dr. Green and the qualifications of Dr. Stevens. Both are board-certified in internal medicine and infectious disease, both had some training in emergency medicine early in their careers, and both consult weekly on infec-

tious disease cases in the emergency room. While neither is board-certified in emergency medicine, the same is true of Dr. Hrabal. The record contains evidence that both are sufficiently familiar with the standard of care in treating infectious disease in the emergency room that their testimony would assist the jury in determining facts in issue.

[¶ 34] The district court's reason for sustaining the objection to Dr. Green's testimony was that Dr. Green would be violating his professional ethics by testifying because he did not have "recent and substantive experience in the field or line of practice" about which he intended to testify. This justification fails for several reasons. First, the source of that ethical standard is not identified in the record. Second, there was no testimony from any medical professional that such testimony would violate the ethical standard. Third, Dr. Green's qualifications are such that he did have "recent and substantive experience in the field or line of practice." Fourth, a medical expert's qualifications are determined under W.R.E. 702 and Wyo. Stat. Ann. § 1–12–601, not under some unidentified code of professional conduct. And finally, it goes without saying that if Dr. Green's testimony was, indeed, violative of his code of ethics, so likewise would have been the testimony of Dr. Stevens.

[¶ 35] We hold that, it was an abuse of discretion for the district court to preclude Dr. Green's standard of care testimony. No formal offer of proof was required to apprise the district court of the nature of the error and to preserve the issue for appeal because the substance of the precluded testimony was apparent from the circumstances. Further, the appellants were unfairly prejudiced by the ruling because the appellees' infectious disease expert was allowed to give standard of care testimony while the appellants' was not. This is especially troublesome in light of the jury's obvious difficulty in determining the standard of care by which they were to measure Dr. Hrabal's conduct.

***Did the district court err in precluding the appellants' retained expert from offering opinions as to the standard of care for an infectious disease consultant?***

[¶ 36] Dr. Tredal, the appellants' emergency medicine expert, testified that the

standard of care required Dr. Hrabal to consult with an infectious disease specialist:

Q. Do you consult with infectious disease consultants in the emergency room?

A. Yes.

Q. Often?

A. Reasonably—relatively frequently, yes.

Q. On cases like this?

A. Sure.

Q. And in this presentation would that have been reasonable and appropriate?

A. Yes, particularly if you weren't sure, if you hadn't been able to reasonably evaluate the patient yourself, sure.

In later following up on this line of inquiry with Dr. Green, the appellants' counsel attempted to establish what the infectious disease consultant would do when brought into the case:

Q. Now, if you had been called to the emergency room that day for a consultation, would a reasonable and prudent infectious disease consultant have been required to rule out a differential diagnosis of primary or secondary bacterial infection?

A. Yes. An infectious disease specialist would have done that. But I think it is also important to know that any medical physician—

MR. RUTLEDGE: Excuse me, Your Honor. I'm going to object to the last part of the answer as being nonresponsive.

THE WITNESS: I'm sorry, Your Honor.

THE COURT: Restate your question. Let's hear the answer one more time.

Q. (BY MR. PICKERING): Well, would an infectious disease consultant having been called to the emergency department be required to rule out in the differential diagnosis in Mr. Armstrong?

THE COURT: That calls for a yes or no.

THE WITNESS: Yes.

Q. (BY MR. PICKERING): And that would have been on February 28, '99?

A. That's correct.

Q. And what would a reasonable infectious disease consultant, reasonable and prudent infectious disease consultant would have had to do to rule it out? I mean what—tell me what they should have done?

MR. RUTLEDGE: I don't know what the relevance is of what an infectious disease specialist would have done, Your Honor.

MR. PICKERING: It is relevant, Your Honor, because—

THE COURT: Just a minute. Sustained.

MR. PICKERING: May I make an argument, please?

THE COURT: Just a minute. Don't make arguments before the jury.

(Whereupon the following proceedings were had at the bench.)

THE COURT: Okay. Lower your voice.

MR. PICKERING: Dr. Tredal testified that consultation would have been appropriate with an infectious disease consultant and required by the standard of care. If that had happened and one had been called, then I think he's entitled to testify what would have occurred.

THE COURT: Kent?

MR. RUTLEDGE: I don't think it makes any difference. In this case they did call an infectious disease specialist later on in the course of the case. And we know what did occur.

THE COURT: I'm going to sustain the objection.

[¶ 37] During the pretrial hearing upon the appellants' motion *in limine* directed at Dr. Stevens' standard of care testimony, the appellees argued that the question of causation and the question of standard of care were "inextricably interwoven." That same concept leads to the conclusion that the district court erred in sustaining the appellees' objection to Dr. Green's testimony as to what an infectious disease consultant would do if called into the emergency room. Dr. Tredal testified that the standard of care required Dr. Hrabal to consult with an infectious disease specialist. It would be impossible for the jury to decide whether or not Dr. Hra-

bal's failure to seek such consultation played any part in causing the appellants' damages without knowing what the infectious disease specialist would do. If, for instance, the infectious disease experts agreed that a reasonable and prudent specialist in their field would do nothing more than what Dr. Hrabal had already done, then the failure to seek a consultation would have no causative effect.

[¶ 38] The appellants did not make an offer of proof when the appellees' objection to Dr. Green's testimony was sustained. In this Court, they contend that Dr. Green would have testified as follows in accordance with his disclosure:

> [T]hat a reasonable and prudent infectious disease specialist "should have, at a minimum, ordered the tests identified above, including blood cultures with gram stains, if not already obtained. It is likely that culture results would have been returned within 12 hours, if not earlier, and would have been positive. Gram stains could have provided earlier important information. Mr. Armstrong should have then been immediately treated with IV antibiotics appropriate to the results of the gram stain and appropriate to a patient with his allergies."

[¶ 39] Despite the district court's abuse of discretion in sustaining the appellees' motion, we will affirm the decision of the district court because there was no resultant prejudice to the appellants. Dr. Green's testimony takes up 227 pages of trial transcript. During the course of his testimony, he answered numerous questions about the matters quoted above from his disclosure, and his testimony contained detailed information about what tests should have been performed when Armstrong entered the emergency room, what antibiotics he should have been given, and the likelihood that those antibiotics would have prevented the endocarditis. The clear impact of Dr. Green's testimony was a statement of what an infectious disease specialist would have done had he or she been called in for a consultation.

4. W.R.E. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

*Did the district court err in precluding evidence of appellee Hrabal's prior malpractice claims, the suspension of Hrabal's hospital privileges, and other matters affecting her credibility?*

[¶ 40] The appellants' complaint in this case alleged that Dr. Hrabal was negligent in her care of Armstrong. During discovery, the appellants learned of a previous lawsuit against Dr. Hrabal, with similar allegations of negligence. The appellants moved for leave to amend their complaint to add an allegation of negligent misrepresentation based upon Dr. Hrabal's failure to disclose this prior lawsuit to her employer, EMP, and to UMC. The appellees resisted this motion and moved *in limine* to preclude the admission of any evidence of the prior claim.

[¶ 41] In the memorandum written in support of their motion *in limine*, the appellees argued first that the gist of a medical malpractice case is proof of the standard of care and proof that the defendant doctor violated that standard on a particular occasion. Proof that the defendant has been sued before, even under similar circumstances, does not tend to make the existence of these necessary elements any more probable, so the evidence is irrelevant. Second, the appellees argued that, even if such evidence is marginally relevant, it should be excluded under W.R.E. 403 because its probative value is substantially outweighed by the danger of unfair prejudice, because its introduction would tend to mislead and confuse the jury, and because the trial would be unduly lengthened by the need for Dr. Hrabal to defend herself against the earlier accusations.[4] Specifically, the appellees contended that introduction of evidence about the prior lawsuit undoubtedly would lead the jury to impermissible conclusions—that Dr. Hrabal was a bad doctor because she had been sued before, that Dr. Hrabal violated the standard of care once, so she probably did so again in this case, and that the standard of care established by the expert wit-

the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

nesses in the first case was the standard of care in this case, even though those experts were not witnesses in this case.

[¶ 42] The appellants' response to the motion *in limine* emphasized two points: first, that the appellees' experts were not aware of this information when they formulated their opinions that Dr. Hrabal was qualified to work in the emergency department, and second, that Dr. Hrabal's withholding of the information was relevant to her credibility and was therefore admissible under W.R.E. 608(b).[5] In a separate further response, the appellants contended that, if the appellees' expert, Dr. Rosen, was aware of the prior lawsuit when he rendered his opinion that Dr. Hrabal was qualified to serve in the emergency room, then the evidence of the prior lawsuit should be admissible during his cross-examination because the expert who testified against Dr. Hrabal in the prior case was Roger L. Barkin, M.D., who happens to be Dr. Rosen's primary professional collaborator.

[¶ 43] The motion for leave to amend the complaint was heard on July 2, 2002, and was denied by an order filed August 8, 2002. The order does not indicate whether counsel also argued the motion *in limine* at that time, and no transcript of the hearing appears in the record. The motion *in limine* was later mentioned during the final pretrial conference, at which time the district court indicat-ed that it had already ruled on the motion. The order granting the motion *in limine*, which order was filed on the first day of trial, gave no reasons for it having been granted.

[¶ 44] In their appellate brief, the appellants broaden their attack upon the district court's liminal order to include complaints that the district court also prevented them from cross-examining Dr. Hrabal or otherwise presenting evidence that Dr. Hrabal's privileges were suspended at a hospital in Georgia and that she was also sued in New Mexico. As at trial, they contend that the order prevented them from effectively cross-examining Dr. Hrabal as to her credibility, and prevented them from effectively cross-examining Dr. Hrabal's expert witnesses as to the bases of their opinions, particularly as to what they knew about her "fund of knowledge" regarding infectious disease. The appellants rely heavily on *Dysthe*, 2003 WY 20, ¶¶ 19–20, 63 P.3d at 883–84 and *Chrysler Corp. v. Todorovich*, 580 P.2d 1123, 1133 (Wyo.1978), for the proposition that wide latitude should be allowed in the cross-examination of experts to determine the basis of an opinion. They also cite several cases from other jurisdictions where cross-examination of experts about prior specific instances of conduct was allowed.[6]

[¶ 45] In their appellate brief, the appellees support the district court's grant of their

---

**5.** W.R.E. 608(b) states, in pertinent part:
   Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

**6.** *Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926, 932–33 (1st Cir.1991) (evidence of prior malpractice claims and suspension of license admissible as relevant to expert witness' credibility); *Hock v. New York Life Ins. Co.*, 876 P.2d 1242, 1257 (Colo.1994) (evidence of prior lawsuit against expert witness alleging inadequate testing methods admissible as relevant to witness' credibility and accuracy of his testimony); *Raybeck v. Danbury Orthopedic Associates, P.C.*, 72 Conn. App. 359, 805 A.2d 130, 141–42 (2002) (evidence that expert witness treated his own wife's wrist fracture with cast admissible where he asserted the standard of care was to use pins); *Hayes v. Manchester Memorial Hosp.*, 38 Conn.App. 471, 661 A.2d 123, 125 (1995) (evidence of similar prior lawsuit against expert witness admissible as relevant to credibility, motive and bias); *Underhill v. Stephenson*, 756 S.W.2d 459, 461 (Ky. 1988) (evidence of prior lawsuit against expert witness admissible as relevant to bias); *Irish v. Gimbel*, 1997 ME 50, 691 A.2d 664, 674 (1997) (evidence of prior lawsuit admissible to impeach expert witness as to interest or bias); *Wischmeyer v. Schanz*, 449 Mich. 469, 536 N.W.2d 760, 764–65 (1995) (evidence of prior "botched" surgeries performed by expert witness admissible to show witness' lack of competency); *Willoughby v. Wilkins*, 65 N.C.App. 626, 310 S.E.2d 90, 97–98 (1983) (evidence of prior lawsuit against expert witness admissible as relevant to bias or interest).

motion *in limine* with several arguments. After reminding this Court that the standard of review is abuse of discretion, they contend (1) that the proscribed evidence was not relevant; (2) that its foundation was unreliable; (3) that it was an attempt to impeach with extrinsic evidence in violation of W.R.E. 608(b); (4) that it was unfairly prejudicial, confusing, and misleading in violation of W.R.E. 403; (5) that the appellants failed to preserve the issue for review because they did not make an appropriate offer of proof; and (6) that the cases relied upon by the appellants are inapposite because, unlike the expert witnesses in those cases, Dr. Hrabal did not offer expert testimony related to causation and the standard of care.

[¶ 46] The appellees' focal position is that Dr. Hrabal's "fund of knowledge"—her training and past experience—was irrelevant because the issue was not whether she was qualified to treat Armstrong, the question was whether, at a particular point in time, she met the applicable standard of care. The appellees point to *Beavis ex rel. Beavis,* 2001 WY 32, ¶¶ 11–16, 20 P.3d at 512–14, where we affirmed the district court's preclusion of qualification evidence.[7]

[¶ 47] This Court is at a considerable disadvantage in attempting to review the district court's grant of the appellees' motion *in limine* because we do not know the district court's precise reasoning. The record contains neither a transcript of the July 2, 2002, hearing during which the matter apparently was decided nor a decision letter. The order, itself, is devoid of explanation. The best we can do is to glean from the trial transcript a hint as to the basis for the district court's decision. During the cross-examination of Dr. Hrabal, the following exchange occurred:

Q. Have you failed to diagnosis sepsis in 14–year–old boys with meningococcemia?

A. No, sir.

Q. Do you know who Roger Barkin is?

A. Yes, sir.

Q. Is he co-author of the Rosen book?

A. Correct.

Q. Has he ever been critical of you for not diagnosing meningococcemia in a 14–year–old boy?

A. No, sir.

Q. Have you ever read a written affidavit of his where he was critical of you for not diagnosing meningococcemia in a 14–year–old boy?

A. No, sir.

MR. RUTLEDGE: Your Honor, I would object *on the grounds of relevance* to this line of questioning. We're not talking about a 14–year–old boy. We don't have Dr. Barkin here to testify.

THE COURT: Sustained, sustained, Mr. Pickering.

. . .

MR. PICKERING: Your Honor, I think this is important for two reasons and relevant. One is, she was served with a copy of the affidavit of Dr. Barkin; and he was critical of her care. So it directly goes to whether she's an honest and credible witness.

THE COURT: Okay. Thank you.

MR. BAILEY: It also goes to her clinical—

MR. PICKERING: Her fund of knowledge and theories. The reasons why I think it ought to be allowed—

THE COURT: I'm at the verge right now, Mr. Pickering, of declaring a mistrial if this thing continues, you know. You don't open the door by putting an adverse witness on the stand and asking all of these questions. I've given you quite a bit of leeway, but with the understanding that you're not going to violate my order in limine. You're the one that is forcing the issue on this doctor. I don't believe that this is the way doors are opened in my opinion.

Even if it is opened, *Rule 403 prevents you from doing this.* If you were going to do this, from day one *then we would have*

---

7. *Beavis* involved an injection of allergy medication. We held that, where the standard of care for giving such an injection is the same for all medical professionals, the district court did not abuse its discretion in excluding evidence of the qualifications of the medical assistant who administered the injection. *Beavis ex rel. Beavis,* 2001 WY 32, ¶ 15, 20 P.3d at 514.

*to have this other case tried, this other issue of this youngster tried in this case.* It's a complete surprise in a sense. Now, do you want to have it this way, or do you want me to declare a mistrial? I will declare a mistrial.

(Emphasis added.)

[¶ 48] From the entire record, we can assume that the district court sustained the appellees' relevance objection on the ground that Dr. Hrabal's prior experience and qualifications were not relevant to the question of whether she met the standard of care in regard to Armstrong. In context, the district court's reference to W.R.E. 403 suggests an additional concern with either the danger of confusing the issues or the danger of undue delay, or both.[8] We cannot say that the district court abused its discretion in reaching these conclusions, and we note that the relevancy consideration is consistent with *Beavis ex rel. Beavis,* 2001 WY 32, ¶¶ 11–16, 20 P.3d at 512–14. Evidentiary decisions of this nature are left to the sound discretion of the trial court and will not be overturned where the record reveals a legitimate basis for the ruling. *Dysthe,* 2003 WY 20, ¶ 16, 63 P.3d at 883 (*quoting Lancaster,* 2002 WY 45, ¶ 11, 43 P.3d at 87). Here, the district court reasonably could have concluded that any probative value of the earlier alleged incident was outweighed by the spectre of a "trial within a trial" as the appellants tried to prove Dr. Hrabal's negligence in that incident. We affirm the district court's rulings on the motion *in limine* and the objection.

### Did the district court err in denying the appellants' motion for leave to file an amended complaint to allege negligent misrepresentation?

[¶ 49] The Complaint in this case was filed on February 22, 2001. The jury trial began on August 19, 2002. Less than two months before trial, and more than sixteen months after the Complaint was filed, the appellants filed a Motion for Leave to File First Amended Complaint. Both the motion and the proposed amended complaint attached to it raised a second claim against Dr. Hrabal characterized as "negligent misrepresentation." The focus of this new claim was Dr. Hrabal's alleged failure to disclose to her employer, EMP, a prior lawsuit against her for failure properly to diagnose a progressive bacterial infection.

[¶ 50] Although the appellants referred in both their district court motion and their appellate brief to "negligent misrepresentation," and although they cited in both courts to *Husman, Inc. v. Triton Coal Co.,* 809 P.2d 796 (Wyo.1991), which is a negligent misrepresentation case, their specific reference to Restatement (Second) of Torts § 551 (1977) suggests that their proposed claim was actually based in nondisclosure.[9] *See Birt v.*

---

8. The comment that "[w]e don't have Dr. Barkin here to testify[ ]," also indicates the district court had concerns with hearsay testimony as to this extrinsic issue. In its Order Denying Motion for New Trial, the district court emphasized W.R.E. 403 in finding evidence of the prior lawsuit vastly more prejudicial than probative, and in commenting on the danger of a "full-blown trial" of the Georgia case within the present trial.

9. Restatement (Second) of Torts, *supra,* § 551 at 119 reads as follows:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances,

*Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 43, 75 P.3d 640, 656–57 (Wyo.2003). To date, Wyoming has not adopted the tort of nondisclosure, although neither has the tort directly been rejected. *See Lee v. LPP Mortg. Ltd.*, 2003 WY 92, ¶ 33, 74 P.3d 152, 163–64 (Wyo.2003).

[¶ 51] In a legal memorandum filed in the district court in support of their motion, the appellants "shrugged off" both the distinction between the two torts and the fact that this Court had never adopted nondisclosure with the following comments:

> Defendant Hrabal agrees that, if faced with the question, the Supreme Court of Wyoming would adopt the Restatement of Torts (Second) § 551. In any event, Dr. Hrabal undertook a duty to supply truthful and accurate facts as part of the employment screening process and as part of her application for temporary and permanent UMC medical privileges.

Throughout their appellate brief, the appellants continue to blur the distinction between the torts by referring alternatively to Dr. Hrabal's alleged misconduct as a failure to disclose or a misrepresentation. Furthermore, the appellants presented no legal or factual argument suggesting why this Court should adopt Restatement (Second) of Torts, *supra*, § 551.

[¶ 52] The appellees presented before the district court and in this Court several contentions in opposition to the appellants' motion. First, citing *Beaudoin*, 492 P.2d at 970, they argued that the proposed amendment was futile because it failed to state a claim upon which relief can be granted, inasmuch as EMP is the party to whom any duty of disclosure would be owed. Further, citing Restatement (Second) of Torts, *supra*, § 551, cmt. f, the appellees contend that Dr. Hrabal owed no such duty to EMP, because their employee-employer relationship was not a fiduciary relationship as contemplated by Restatement (Second) of Torts, *supra*, § 551.[10] Finally, the appellees argued that the prior lawsuit was not a fact basic to the transaction and that, therefore, any failure to disclose that lawsuit's existence could not form the basis for a cause of action under Restatement (Second) of Torts, *supra*, § 551.[11]

---

would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts, *supra*, § 552 at 126–27 reads as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

  (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

  (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

10.  Restatement (Second) of Torts, *supra*, § 551, cmt. f at 121 reads as follows:

Other relations of trust and confidence [in addition to trustees, agents and corporate directors] include those of the executor of an estate and its beneficiary, a bank and an investing depositor, and those of physician and patient, attorney and client, priest and parishioner, partners, tenants in common and guardian and ward. Members of the same family normally stand in a fiduciary relation to one another, although it is of course obvious that the fact that two men are brothers does not establish relation of trust and confidence when they have become estranged and have not spoken to one another for many years. In addition, certain types of contracts, such as those of suretyship or guaranty, insurance and joint adventure, are recognized as creating in themselves a confidential relation and hence as requiring the utmost good faith and full and fair disclosure of all material facts.

11.  Restatement (Second) of Torts, *supra*, § 551, cmt. j at 123 reads as follows:

*"Facts basic to the transaction."* The word "basic" is used in this Clause in the same sense in which it is used in Comment c under § 16 of the Restatement of Restitution. A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may

[¶ 53] The appellees' second counter-argument is that the motion for leave to amend was untimely. Noting that the appellants' counsel had known of the prior lawsuit at least since October 29, 2001, noting that additional discovery would have been required if the motion was granted, and noting that no experts had been designated to testify about the matter, the appellees argued that adding a new cause of action would have "inject[ed] a host of new factual and legal issues into this litigation at this late date."

[¶ 54] Next, the appellees argued that the motion to amend was made for an improper purpose in that it was made to enable the appellants to suggest to the jury that Dr. Hrabal is a "bad doctor" who previously breached the standard of care so she must have done so again, and to attempt to establish the standard of care in the present case through incompetent expert testimony. This argument, of course, complemented the appellees' position in regard to their own motion *in limine*.

[¶ 55] The Order Denying Plaintiffs' Motion for Leave to File First Amended Complaint was filed on August 8, 2002, only a few days before trial. The order indicates that the motion was heard on July 2, 2002. As with the appellees' motion *in limine*, the record contains neither a hearing transcript nor a decision letter, and the order, itself, contains no justification for its conclusion. Thus, we are left again to surmise as to the reasons for the district court's ruling.

[¶ 56] "This court must affirm the district court's action on appeal if it is sustainable on any legal ground appearing in the record...." *Heilig v. Wyoming Game and Fish Com'n*, 2003 WY 27, ¶ 8, 64 P.3d 734, 737 (Wyo.2003). This rule holds true even where the district court has not articulated on the record the reasons for its action:

> This court must affirm the district court's action on appeal if the judgment is sustainable on any legal ground appearing in the record. *Deisch v. Jay*, 790 P.2d

1273, 1278 (Wyo.1990). Although the orders denying the motions to intervene in these cases do not set out the grounds the district court specifically relied upon, we conclude sufficient bases exist in the records to warrant denial of the motions to intervene.

*Masinter v. Markstein*, 2002 WY 64, ¶ 8, 45 P.3d 237, 241 (Wyo.2002).

[¶ 57] We will affirm the district court's denial of the appellants' motion for leave to amend their complaint. The appellants have not adequately distinguished between the torts of negligent misrepresentation and nondisclosure, they have not adequately advocated for the adoption of the latter tort, and they have not adequately supported their contention that, under either tort, the alleged tortfeasor owes a duty to a third person not party to the transaction. Furthermore, the record supports denial of the motion on the ground that it was untimely.

## CONCLUSION

[¶ 58] The district court did not abuse its discretion in precluding the appellants' retained emergency medicine expert from offering opinions as to the standard of care for treatment, or in precluding the appellants' retained expert from offering opinions as to the standard of care for an infectious disease consultant, or in precluding evidence of Dr. Hrabal's prior malpractice claim, or in denying the appellants' motion to amend their complaint. Nor was it an abuse of discretion to deny the motion for a new trial, where that motion simply reiterated earlier arguments. It was error, however, for the district court to preclude Dr. Green's standard of care testimony while allowing Dr. Stevens' similar testimony. And we cannot find such error to have been harmless, given the jury's stated confusion as to the standard of care.

[¶ 59] We affirm in part, reverse in part, and remand to the district court for a new trial.

---

serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic. If the parties expressly or impliedly place the risk as to the existence

of a fact on one party or if the law places it there by custom or otherwise the other party has no duty of disclosure. (Compare Restatement, Second, Contracts § 296).

LEHMAN, Justice, dissenting.

[¶ 60] I respectfully dissent. I agree with the portions of the majority's opinion that affirm the district court's decisions and find no abuse of discretion. I likewise agree that it was improper for the district court to exclude Dr. Green's standard-of-care testimony. As the majority discussed in ¶ 33, there does not appear to be a meaningful distinction between the qualifications of Dr. Green and Dr. Stevens, and both doctors are sufficiently familiar with the standard of care that their testimony would assist the jury in determining the facts at issue. However, I would find that the district court's error was not prejudicial to the appellants and would therefore affirm this case in its entirety.

[¶ 61] An error warrants reversal only when it is prejudicial and it affects the appellants' substantial rights. *Robinson v. Hamblin,* 914 P.2d 152, 155 (Wyo.1996) (quoting *Candelaria v. State,* 895 P.2d 434, 439–40 (Wyo.1995)). Generally, to be prejudicial an error must "cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process ... [or possess] a clear capacity to bring about an unjust result." *Natural Gas Processing Co. v. Hull,* 886 P.2d 1181, 1188 (Wyo.1994) (citations omitted). In this case, I cannot conclude that the error caused a miscarriage of justice or compromised the fairness of the proceedings, and I consequently do not believe the error requires reversal.

[¶ 62] My review of Dr. Stevens' testimony shows that, although it was determined at the pretrial hearing that Dr. Stevens could testify about the standard of care, he never expressly testified on that subject. Dr. Steven's testimony, as a whole, centered on causation. He mainly testified as to when he believed Mr. Armstrong contracted the infection and why he believed that. Dr. Stevens' conclusions in this area were based on the history of the events from February 28 to March 3. As a result, Dr. Stevens discussed some of the tests performed and the care given to Mr. Armstrong during this time. Because such a discussion is intertwined to some extent with the standard of care, Dr. Stevens' testimony certainly danced around the standard of care topic. However, the ultimate point of Dr. Stevens' testimony was that of causation. The defendant did not elicit standard of care opinions from Dr. Stevens, and it appears he never expressly offered such opinions.

[¶ 63] A review of Dr. Green's testimony shows that although the district court ruled that Dr. Green could not testify about the standard of care, he did continue to testify about his conclusions regarding Mr. Armstrong's infection. Similar to Dr. Stevens, Dr. Green did not expressly offer a standard of care opinion. Nevertheless, Dr. Green did offer extensive testimony. Included in this testimony was his opinion as to whether Mr. Armstrong had the infection on February 28 and why he concluded this. Dr. Green's testimony in this area similarly included elements of the standard of care but to a much greater extent than the testimony of Dr. Stevens. In fact, Dr. Green testified about what questions should have been asked of Mr. Armstrong, about what symptoms should have raised a red flag that there was an infection, that a blood test would have shown abnormalities, that antibiotics would have helped, and that Dr. Hrabal had the "golden moment" to prevent Mr. Armstrong's infection. While this testimony was not an express opinion on the standard of care either, it was significantly closer to such testimony than that of Dr. Stevens. I would consider this testimony, combined with the testimony of Dr. Tredal, sufficient to counter the testimony offered by Dr. Rosen, the appellee's standard of care expert.

[¶ 64] Thus, considering the trial as a whole, I cannot conclude that there was a miscarriage of justice or that the appellants were denied a fair trial due to the district court's error. I would therefore hold that the district court's error was not prejudicial to the appellants. As a result, I would affirm this case in its entirety.